GARFIELD MEMORIAL HOSPITAL
v. MARSHALL et al.

MARSHALL et al. v. O'DONNELL.

Nos. 10984, 10808.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 14, 1952.

Decided April 30, 1953.

◆

Mr. H. Mason Welch, Washington, D. C., with whom Messrs. John R. Daily and J. Harry Welch, Washington, D. C., were on the brief, for appellee in Case No. 10,808 and on the brief for appellant in Case No. 10,984.

Mr. James W. Lauderdale, Washington, D. C., with whom Messrs. Manuel J. Davis and Karl Michelet, Washington, D. C., were on the brief, for appellants in Case No. 10,808 and on the brief for appellees in Case No. 10,984.

Before WILBUR K. MILLER, PROCTOR and FAHY, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Noel Frances Marshall suffered an injury which produced an intracranial hemorrhage when she was prematurely born in Garfield Memorial Hospital January 23, 1947. As a result she is in a spastic condition, ninety per cent deficient and incurable. Through her father, George C. Marshall, as next friend, she sued the hospital, alleging its negligent failure to provide proper care and attention during Mrs. Marshall's labor and delivery caused the injury and produced the spastic condition. Marshall also sued in his individual capacity. The jury awarded $55,000 to the infant plaintiff, and $2,000 to her father. On the appeal, No. 10,984, by Garfield Hospital from the judgment entered pursuant to the jury's verdict, the principal questions are whether the hospital was negligent and, if so, whether there was a causal connection between its negligence and the child's injury.

It is essential, therefore, to ascertain what took place at the hospital during the afternoon and evening of January 23rd. The principal participants in those events were Mrs. Marshall, Misses Holloway and Heinsohn, who were the ward nurses on duty, and Dr. Irani, a physician employed by the hospital, who was the "assistant resident" in charge of the obstetrical ward. We shall summarize the testimony of each of those four persons with respect to Mrs.

Marshall's care from the beginning of labor at 2:00 p. m. until delivery at 11:20 p. m., with occasional references to the hospital records and other evidence necessary to complete the narrative.

On January 6, 1947, when Mrs. Marshall, already the mother of two children, was in the seventh month of pregnancy, she suffered a rupture of the uterine membranes. At the direction of her private physician, Dr. Howard D. Parker, she entered Garfield the next day. The ruptured condition of the membranes, which made probable a premature and rapid delivery, was noted on the hospital's record of admission.

Dr. Parker visited Mrs. Marshall each day until about January 15, when he left on a vacation trip and turned her case over to Dr. Roger O'Donnell, Jr., his associate. From then until the day of birth Dr. O'Donnell saw the patient each day, the last time before delivery being some time during the morning hours of January 23. Dr. Irani also saw Mrs. Marshall daily, sometimes more than once.

On the day of Noel's birth, Miss Holloway was the ward nurse on duty from 3:00 p. m. until she was relieved at 11:00 p. m. by Miss Heinsohn. According to the hospital record and other evidence in the case, labor began at 2:00 p. m. Mrs. Marshall, who had herself been a nurse, carefully observed the progress of her labor, timed the frequency and duration of her contractions, and testified as to their progressive intensity. The following synopsis of her testimony as to the events from 2:00 p. m. until 11:40 p. m. is largely in her own words.

Contractions started at 2:00 p. m. and were from 5 to 8 minutes apart. They gradually grew more severe, more regular, until at 5:30 p. m. they were 5 minutes apart. At that time she refused supper except liquids, whereupon Miss Holloway called Dr. Irani. He did not come until 7:30 p. m., when the pains were very severe, made a rectal examination (the purpose of which is to determine whether the patient has dilated), and left. "They [the pains] progressed, became harder, closer, until about 9:30, they were two minutes

apart and, at that time, they were lasting from forty to seventy seconds." About 9:30, in response to a call from Miss Holloway, Dr. Irani came in, felt the contractions, and told Mrs. Marshall she had nothing to worry about. He then stepped outside, telephoned Dr. O'Donnell, gave him a report on the 7:30 rectal, told him she was having "a few mild contractions," and re-entered the room. Mrs. Marshall asked him to get Dr. O'Donnell and to do something for her. He felt the contractions and said again, "You have nothing to worry about."

Mr. Marshall, who was visiting his wife at the time, followed Dr. Irani into the hall and talked with him briefly. The following from Marshall's testimony was not denied by Dr. Irani:

"Q. Will you tell us what was said by Dr. Irani and by you? A. I told Dr. Irani that that baby was going to be born before midnight; that Mrs. Marshall knew what she was saying when she told him that she was in definite labor. I told him that I had seen her in labor twice before, and that this was no different from the other two times.

"Q. What did he say? A. He said, 'I am in touch with Dr. O'Donnell and he says we will save that baby for another week or ten days.'"

Seconal and demerol were administered and the patient dozed. About 10:15 she was awakened by what she described as a "terrific pain," after which the pains were wave-like. There was no definite break in them and around 10:40 or 10:45 she was struck by one continuous pain which did not abate until the child's head was down, had left the uterus.

When the pain awakened her at 10:15, Mrs. Marshall shouted for Miss Holloway, who responded at once, felt the contractions and within 5 minutes telephoned Dr. Irani, after which she reported to the patient the doctor had said to call back later. Miss Holloway tried twice after that to reach Dr. Irani by telephone, the last time at 11:00 p. m., when the response was that he was "scrubbed," that is, he was sterilized

and in an operating or delivery room, and could not come.

Miss Heinsohn, who had just arrived to relieve Miss Holloway, was given by the latter a detailed report of the patient's condition during the preceding eight hours, including the regularity and severity of the pains, and the fact that her several efforts to get Dr. Irani, beginning about 10:20, had been unsuccessful. Miss Heinsohn had hardly come on duty when Mrs. Marshall told her "the baby's head is down." The nurse made a visual examination, telephoned the delivery room that she was coming with a patient, and brought in a delivery cart, which she held while Mrs. Marshall, without any assistance, worked herself upon it from the bed. The baby's head was then protruding from the vagina, plainly visible. Warning Mrs. Marshall to keep her elbows in, Miss Heinsohn pushed the cart rapidly through the corridors and arrived at the delivery room in about 2 minutes.

Mrs. Marshall thus described her mental and nervous condition from the time she awakened at 10:15 p. m. until she reached the delivery room:

"I was nervous. I was apprehensive. My pains were wave-like; no doctor, no resident, no one in attendance except the nurse when I called her.

\* \* \* \* \* \*

"I became more apprehensive, more nervous, more tense as the pain increased in severity because no doctor was there; the baby was on its way; no one to help me until I became quite panicky before the baby was born."

Upon arrival at the delivery room, two nurses were there making hurried preparations. The cart was placed alongside the delivery table and was held while Mrs. Marshall, without assistance, rolled over upon it. As she did so she "was trying to prevent any pressure from my legs on the baby's head or to prevent bumping the baby's head." "I had barely gotten onto the table after much struggling," she said, "when the baby was born. \* \* \* She shot out more than her own length on the

delivery table. * * * There was a thud," caused by "The baby hitting the table."

The two nurses were still on the other side of the room. One said to the other, "Get a doctor quick; any doctor." One left and returned with Dr. Radford Brown, a private obstetrician who happened to be nearby. A delivery room nurse was severing the umbilical cord when Dr. Brown arrived. He was not scrubbed and was in street clothes, but he completed the third stage of labor, which consisted of expelling the placenta. Dr. Lois Platt, an interne, arrived after Dr. Brown had left, and Dr. O'Donnell, who had hurriedly dressed and come from his home after being notified of the birth, came in at 11:40. Dr. Irani did not see Mrs. Marshall after his visit about 9:00 p. m.

Such is the story of the labor and delivery as told to the jury by Mrs. Marshall. It was corroborated in the main, except for slight variations as to the time of events, by Misses Holloway and Heinsohn. The former said Dr. Irani told her on his second visit, between 8:30 and 9:00, that Mrs. Marshall was not in labor. She administered the seconal and demerol about 8:30. When Mrs. Marshall awakened from the subsequent sleep, which the nurse thought was about 9:30, Miss Holloway attempted to telephone Dr. Irani but was unable to get him, and then called the delivery room and told the nurse who answered to send a resident or an interne over to see the patient. Miss Holloway telephoned for assistance three or four times from the time Mrs. Marshall awakened until she went off duty, but no one came in response. On one of the calls, which she thought was between 10:00 and 10:30, she talked to Dr. Irani, who told her he would be over, but he did not come.

When Miss Heinsohn arrived about 11:00 p. m., Miss Holloway said she told her "About Mrs. Marshall's pains, how frequent they were, and trying to get Willard [the hospital name for the delivery room] and no one coming." She tried to get Dr. Irani shortly after 11:00, but the nurse who answered said he was scrubbed and was delivering triplets. Miss Holloway testified that about 9:30 Mrs. Marshall's condition of labor indicated to her that, according to the procedures of the hospital, she should have been taken to the labor room, which is in the suite in which the delivery room is located.

Miss Heinsohn testified that when she came on duty on the night of January 23, Miss Holloway "told me Mrs. Marshall was apparently in labor, and she had called the Resident several times, and she called the Resident while I was on duty, I believe at 11:00 o'clock. * * * She told me that the Resident didn't think the patient was in labor, and didn't pay much attention to her." After receiving Miss Holloway's report, Miss Heinsohn immediately went in to see Mrs. Marshall and administered demerol, as a resident in the delivery room had instructed in the last telephone call.

Miss Heinsohn continued by saying that about 11:15, after Mrs. Marshall told her she felt the baby's head coming down, "I called the delivery room and I said I was bringing Mrs. Marshall over, that she had a premature baby and she was ready to deliver. I took * * * her to the delivery room immediately, and as she was moved over to the table—when she was completely moved over, the baby was born, and without an anesthetic, and no doctor was present at the time." Miss Heinsohn further said the baby was born almost instantly after Mrs. Marshall was moved from the cart to the table. One delivery room nurse was facing them and one's back was turned. After the child was born, the two nurses in the delivery room took over and Miss Heinsohn left.

Dr. Irani testified for the defendant hospital. He had very little, if any, recollection of the events of the evening of January 23, 1947, and relied upon the hospital records to refresh his memory. At 8:30 p. m., which was recorded as the hour of his second visit to Mrs. Marshall, he did not think she was any closer to actual labor than on the early morning of January 22. He could not recall telephoning Dr. O'Donnell. That same night, about 9:00 p. m., he personally admitted to the hospital as a house patient a Mrs. Warren. The formalities of admission, which included ex-

amining the new patient, checking her contractions, doing a rectal examination, and writing up the admission record, took approximately 20 or 30 minutes. With the assistance of the interne then on duty, Dr. Lois Platt, he delivered Mrs. Warren's triplets, which were born at 10:45, 10:55 and 11:25. Dr. Irani testified that it probably took him 15 minutes to help get Mrs. Warren on the stretcher and take her to the delivery room and then to prepare himself by scrubbing and dressing. We quote from the transcript of his testimony:

"Q. Assuming that you completed your examination of Mrs. Warren and the preparation of her for her admission record and attended to the transfer of her from the admission office to the delivery ward, that took you some 30 minutes, and then assuming that at or about 10:30 you began scrubbing in preparation for the delivery, which actually occurred as to the first baby at 10:45, do you have any independent recollection of what you were doing between, we will say, 9:30 and 10:30? A. No, I don't remember.

"Q. Did you receive any telephone call between 9:30 and 10:30 of which you have any recollection now? A. I have no recollection.

\* \* \* \* \* \*

"Q. Did you at any time receive any communication from anybody with respect to Mrs. Marshall and refuse to go to Mrs. Marshall? A. I am sure that could not be so."

Although he could recall nothing about Mrs. Marshall, he did recollect Mrs. Warren's case, "because," he said, "you only get one set of triplets in your lifetime \* \* \*."

Dr. Irani and Dr. Platt were the only members of the hospital staff on duty for obstetrical service in Garfield Hospital on the night of January 23, 1947, and both were engaged in the delivery of the triplets. But Dr. S. Hazen Shea, a private physician, was an associate on the Garfield Hospital obstretical staff a position which required him to respond to calls. That night he responded to a call from someone at Garfield—Dr. Irani, he thought—to come

to see Mrs. Warren. He thereupon went to the hospital but arrived after the last of the triplets had been delivered. He received no other calls that evening from the hospital.

The foregoing summaries of their testimony show substantial agreement among the four principal actors as to the happenings between 2:00 p. m. and 11:20 p. m., and as to what the hospital's physicians and nurses did for Mrs. Marshall—and what they did not do for her—during labor and delivery. Whether their acts and omissions sufficiently supported the jury's conclusion that the hospital was negligent is the immediate question. It is necessary first to ascertain what duty the hospital owed Mrs. Marshall.

█ In general it is the duty of a private hospital to give a patient such reasonable care and attention as the patient's known condition requires. This duty is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community, and by the express or implied contract with the patient. Valentin v. La Societe Francaise De Bienfaisance Mutuelle De Los Angeles, 1946, 76 Cal.App. 2d 1, 172 P.2d 359; Rice v. California Lutheran Hospital, 1945, 27 Cal.2d 296, 163 P.2d 860; Wood v. Samaritan Institution, 1945, 26 Cal.2d 847, 161 P.2d 556; South Highlands Infirmary v. Galloway, 1936, 233 Ala. 276, 171 So. 250; Birmingham Baptist Hospital v. Branton, 1928, 218 Ala. 464, 118 So. 741.

█ If a hospital undertakes to render services customarily performed by physicians, it must perform such services with the same degree of care to which a private physician is held; that is to say, the physician employed by the hospital must exercise the ordinary skill and care which is exercised generally by the members of his profession in the community, giving consideration to modern learning.

It is generally true that a patient enters a maternity hospital not only that she may receive constant nursing care, but also that she may have the services of a doctor, when required, during the absence of her private physician and until he can respond to the

hospital's summons. Garfield Hospital recognized those objectives and undertook to perform such services. It employed four physicians in its maternity ward, two of whom were constantly on duty. In addition, as we have said, it had on its staff on the evening of January 23, 1947, Dr. S. Hazen Shea, an associate in obstetrics whose duty it was to respond to calls. The services of these men were not restricted to "house" patients who had no private physician. This appears from the fact that Dr. Hodges, an interne, examined and prescribed for Mrs. Marshall when she entered the hospital on January 7 and left a memorandum for the nurses which read, "If pains start call Hodges." Moreover, Dr. Irani called on Mrs. Marshall every day, sometimes more than once. Unquestionably the hospital had undertaken to furnish medical service in the absence of Dr. O'Donnell.

Dr. John L. Parks, testifying for the hospital, said that when the nurse on the ward having charge of the expectant mother of a premature baby was of the opinion at 9:30 p. m., and continued to be of that opinion until she left duty at 11:00 p. m., that the woman's condition required her immediate transfer to the labor room, it was her duty to report the patient's condition to a member of the house staff or to the private physician. In an emergency, he said, nurses frequently call the physician directly; in a "good staff organized hospital," such as Garfield, usually the orders, calls and procedures go through the house staff.

Dr. Parker testified that, in accordance with good practice prevailing in the District of Columbia, the private physician should be called when regular labor starts, for the purpose of attending the actual delivery. He said, "any woman that is in premature labor preferably should have constant attention."

Dr. Irani himself testified that it is customary to keep in touch with the private obstetrician and to advise him periodically as to the condition of the mother; that the private physician acts on that information as to when he should come over and usually comes as soon as the patient is in labor.

From the foregoing and other evidence, and from the teaching of common sense, we conclude that it was the duty of the attending nurse to call an interne when she thought the patient's condition required the services of a physician; that it was the duty of the interne to respond to that call, if possible; that it was the duty of the interne, or in an emergency the nurse, to call the private physician when true labor began. It was the further duty of the hospital, when the process of delivery was obviously imminent or had commenced, to endeavor to furnish an interne or other physician to act until the privately employed doctor could arrive.

■ In the face of the evidence we have summarized, the defendant hospital argues there was no showing of negligence. Despite the undisputed evidence that Mrs. Marshall was without the care of a physician after about 9:00 or 9:30, although doctors both in and out of the hospital were available; despite the uncontroverted evidence of the hazardous journey to the delivery room with the baby's head already protruding, the practically unassisted move from the cart to the delivery table, the unattended precipitous delivery, and the fall of the baby upon the rubber mat on the metal table—despite all this, Drs. O'Donnell, Parks and Parker, testifying for the hospital, said, in effect, the hospital's physicians and nurses acted in accordance with good and accepted standards of hospital service in the District of Columbia at that time.

The jury did not, and was not required to, accept this somewhat startling statement. In Byrom v. Eastern Dispensary and Casualty Hospital, 1943, 78 U.S.App.D.C. 42, 43, 136 F.2d 278, 279, we said non-expert evidence of conditions and results may be accepted on the question of negligence; and we quoted with approval this language from Cornwell v. Sleicher, 1922, 119 Wash. 573, 205 P. 1059, 1061:

"* * * [T]here must be, in the nature of things, many instances where the facts alone prove the negligence, and where it is unnecessary to have the opinions of persons skilled in the par-

ticular science to show unskillful and negligent treatment."

We think the Byrom case has application here.

■■ The record abounds with instances which, taken singly or in combination, sufficiently support the jury's conclusion that the hospital was negligent. Without enumerating all such instances, we point out the following from which the jury could conclude there was negligence:

(a) The failure to call Dr. O'Donnell, who said, as a witness for the defendant, he would have been on his way to the hospital had he known the events which were taking place around 10:15 p. m. We observe that, had he been called, he could have been there in 20 minutes; and had he been there, or if either Dr. Irani or Dr. Platt had responded to Miss Holloway's calls for help, or if Dr. Shea had been summoned for Mrs. Marshall as he was for the mother of triplets, it is reasonable to conclude the hurried trip to the delivery room would have been avoided, the baby's head would have been guided as it emerged, and its fall to the delivery table mat would not have occurred.

(b) Dr. Irani's failure to ascertain at least between 8:30 and 9:30 that Mrs. Marshall was in true labor, which Dr. O'Donnell said he could easily have done, and his consequent failure to report the condition to Dr. O'Donnell or to send Mrs. Marshall to the labor room. Dr. Irani's failure to respond to Miss Holloway's numerous calls or to send Dr. Platt or to call Dr. Shea or Dr. O'Donnell.

(c) Miss Holloway's failure to call Dr. O'Donnell when she could not get Dr. Irani.

(d) The failure of the delivery room nurses to assist Mrs. Marshall from the cart to the table or to be at her side when delivery occurred.

The fact that Drs. Irani and Platt were attending the birth of triplets does not seem to us to excuse or justify leaving Mrs. Marshall without attention. No showing was made by the hospital as to why one of them could not have gone to Mrs. Marshall's assistance, nor as to why neither Dr. O'Donnell nor Dr. Shea was called. Our conclusion is that the facts we have recited amply supported the jury in finding the hospital negligent.

Aside from those facts, there was some evidence and much argument as to medication and surgery in connection with the question of negligence. Dr. Hodges administered hykinone on January 7 when Mrs. Marshall entered the hospital, after which none was given. During labor seconal and demerol were given, the latter at 11:10 p. m. She received no sort of conduction anesthesia and an episiotomy was not performed. Dr. Louis Hellman, associate professor of obstetrics at Johns Hopkins, said hykinone should have been administered during labor, but sedative drugs and demerol should have been omitted, and an episiotomy should have been done if the perineum was at all tight. Dr. Parks said it was not good practice to give demerol at 11:10 p. m. The fact that hykinone and anesthesia were not given and episiotomy was not performed, and the fact that seconal and demerol were given during labor, were accurately recited in various hypothetical questions, and so may have played some part in the formation of the experts' opinions and also may have had some weight with the jury. Whether so or not we regard as unimportant since, without those factors, the evidence of negligence was sufficient to go to the jury.

We come now to the question of causation. The appellant's position is that its alleged negligence was not shown to have caused the brain injury, which could have resulted from the mother's muscular contractions or from some inherent defect. From this it urges that the jury necessarily speculated in finding a causal connection between the negligence and the injury.

Dr. Hellman testified that the precipitous delivery, which he said could have been prevented by the presence of a physician at or about 11:00 p. m., could have been one of the causes of the brain damage, and that adequate control of the baby's head during birth should have helped to prevent such an injury. He said that lack of care was one of the contributing factors to the brain damage.

Dr. Hellman further said that, even if the child were destined by fate to have the in-

jury, the extent of residual brain damage would vary in proportion to the presence or absence of proper obstetrical techniques, which he described as being proper supervision of labor and delivery by a physician, administration of vitamin K to the mother during labor, omission of seconal and demerol during labor, the performance of episiotomy when indicated, control of the head during delivery, and probably the administration of some form of block anesthesia.

Some experts thought the injury might have been inflicted during the mechanics of labor, no matter how carefully supervised, or could have resulted from some unknown prenatal cause. To conclude that the brain damage was done in that fashion would be a speculative inference which the jury was not required to make, for nobody did or could testify that the mother's contractions actually injured the baby's head, or that it had some fundamental natural defect. Nevertheless, the appellant was given the benefit of those possibilities, as the trial judge submitted to the jury the question whether some cause beyond the control of the hospital, and for which it was in no wise responsible, produced the brain injury. We quote from the charge:

"If you find the condition to be due to natural causes, then you need proceed no further, and your verdict must be for the defendant."

The verdict for the plaintiffs constituted a rejection of the speculative causal possibilities suggested by the appellant.

In addition to the expert testimony that the child's brain might have been injured by some unproved cause for which the hospital was not responsible, the jury had before it the undisputed fact that the baby's soft skull struck the mat-covered metal table, the expert opinion that such an incident could injure the brain so as to produce spasticity, and the conceded fact that subsequently spasticity developed. In those circumstances the inference that the blow on the head caused the child's present condition cannot be said to be unsupported by probative facts or to be so unreasonable as to warrant taking the case from the jury. Lavender v. Kurn, 1946, 327 U.S. 645, 652,

66 S.Ct. 740, 90 L.Ed. 916. The jury was not required, we think, to put aside this affirmative evidence on the speculation that some unproved factor may have caused the injury. As was said in the Lavender case, 327 U.S. at page 653, 66 S.Ct. at page 744:

" * * * Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable."

See also Christie v. Callahan, 1941, 75 U.S. App.D.C. 133, 124 F.2d 825.

■ Other errors assigned by appellant require brief discussion. The trial court permitted medical authorities to be used in the cross-examination of Dr. O'Donnell. This was highly prejudicial to it, says the hospital, and was erroneous because the doctor said he relied on his own opinion in giving his expert testimony. Cases are cited to the proposition that a medical expert witness who relies on his own opinions and experience may not be cross-examined concerning material in text books upon which he did not rely in his answers on direct examination.

Such cases are not applicable here because Dr. O'Donnell stated on cross-examination that, in testifying, he did not rely solely on his own opinion but also upon "known medical authorities." He further said, " * * * I supported them [his opinions] by recognized obstetrical authorities." Again he said,

"I try to read all of the literature on obstetrics or as much of it as I can.

* * * * * *

" * * * I rely on the concensus of opinion *in all of the medical literature.*" (Our emphasis.)

The appellant's argument falls with the failure of its premise. Since he relied on

:all medical literature, it was not error to permit the use of medical authorities in the doctor's cross-examination.

Appellant says the court erred in refusing to grant its motion for a mistrial because of "highly prejudicial remarks of [appellees'] counsel." The contention is based upon a question propounded by appellees' counsel to the Administrator of the hospital, whom he had called as a witness, and upon the discussion in the presence of the jury which followed. Having said entries as to the condition of the patient are recorded by nurses and doctors, the Administrator was asked this question by appellees' counsel, "Would you say that those entries are made when changes in condition occur?" Before the witness could answer, and without asking leave to approach the bench, appellant's counsel objected thus:

"* * * If the Court please, I object to that type of characterization. I think it is perfectly obvious. It does not need any testimony that the entries speak for themselves. They indicate a course of events and they are apparently put on the record by somebody who has a duty in that regard or that respect.

"If counsel's inference is that there are absences in this record because somebody didn't put down something at a particular time when he or she should have done it, there is a way to prove that. This is not the way to do it. The question that is asked there has a selfevident answer. The record speaks for itself."

Appellees' counsel replied that his adversary "puts his finger on the precise point. It is to build up to the point that some records have been destroyed."

 Following this a colloquy occurred between counsel and court which fills about five pages of the printed record before us, in which appellant's attorney used somewhat intemperate language within the hearing of the jury and moved for a mistrial. His own remarks, which should have been made at the bench, may have had a tendency to prejudice the jury, but nobody can say whether against the hospital or against the Marshalls. Regardless of that, however, the witness stated there were progress records of January 22 and January 24 but none made by a physician on January 23. The trial judge ruled, correctly we think, that it was not improper to give this information to the jury so that it might be used as a basis for urging the jury to deduce from it that progress notations of January 23 had once existed. We think there was no error.

The appellant complains further that improper hypothetical questions were permitted and that the testimony of Dr. Hellman should have been stricken. It criticizes the judge's charge to the jury and says that certain instructions offered by it were erroneously rejected. We think the contrary, but deem it unnecessary to prolong this opinion by detailed discussion of the appellant's contentions, which we regard as insubstantial.

On the whole, the case was carefully and fairly tried. We see no reason to disturb the judgment.

*Case No. 10,808.*

 In the same complaint the child and her father also sued Dr. O'Donnell. The two cases were docketed separately in the District Court but were tried together and, at the conclusion of plaintiffs' evidence, the district judge directed a verdict in favor of the doctor. This appeal by the Marshalls from the judgment dismissing Dr. O'Donnell need not detain us long. As the trial judge pointed out, there was no evidence of negligence on the part of the individual defendant. He called on Mrs. Marshall on January 23 some time between 8:00 and 11:00 a. m., at which time there was no evidence of labor.

The only information given to him by Dr. Irani in the telephone call between 9:00 and 9:30 p. m. was that Mrs. Marshall was having a few mild contractions and that the rectal examination done nearly two hours before had not revealed dilation. There was no evidence that Dr. O'Donnell received any additional information with respect to Mrs. Marshall's condition until one of the delivery room nurses called him

after the delivery, whereupon he dressed and reached the hospital at 11:40 p. m. Had he known what was going on at 10:15 p. m., he would have been on his way to the hospital and could have reached there in 20 minutes.

In these circumstances, there is no basis for charging Dr. O'Donnell with negligence. The trial judge did not err in directing a verdict in his favor.

Case No. 10,808 affirmed; Case No. 10,-984 affirmed.