WILLIAM M. FOLEY, JR., SPECIAL ADMINISTRATOR OF THE ESTATE OF JANE FOLEY, DECEASED, APPELLANT, V. BISHOP CLARKSON MEMORIAL HOSPITAL, APPELLEE.

173 N. W. 2d 881

Filed January 23, 1970. No. 37284.

Daniel G. Dolan and Dennis T. Chapman of Lathrop & Albracht, for appellant.

Charles F. Gotch of Cassem, Tierney, Adams & Henatsch, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

NEWTON, J.

This action is brought by William M. Foley, Jr., special administrator of the estate of Jane Foley, deceased, to recover for her death. Jane Foley was delivered of a child in the defendant hospital and thereafter developed a severe beta hemolytic streptococcus infection which caused her death approximately 31 hours after the birth of her child. At the conclusion of plaintiff's evidence, the trial court sustained defendant's motion for a directed verdict and entered judgment for defendant. We reverse the judgment of the district court.

Viewing the evidence from a standpoint most favorable to plaintiff, the following facts appear.

During her pregnancy, Jane Foley had consulted with and was under the care of a private physician. She entered the hospital at 5:20 a.m. on August 20, 1964, gave birth at 2:30 p.m. on that day, and died at 9:15 p.m. the following day. She had been treated by her physician for a sore throat during July and August 1964, and several days after her death, one of her children was treated in the hospital for a "strep throat." There is no evidence in the record that Mrs. Foley made complaint of a sore throat while in the hospital. One nurse testified that an intern was called who checked her chest, throat, and abdomen at about 7:30 p.m. on August 20. At that time she had told the nurse she had had a cold throughout her pregnancy and a severe sore throat 2 weeks before. There were two interns in the hospital. The one thought by the nurse to have been called denied examining Mrs. Foley, but admitted he was called and the other said he had no recollection of Mrs. Foley or her case.

The hospital rules require that a history and physical examination shall be written promptly on admission of a patient, with 24 hours considered as the limit of promptness. One rule states: "All necessary admission information is collected with particular attention to possibility of infection. Suspicion of infection is reported to the

physician immediately." No history was taken although Mrs. Foley was examined several times in regard to the progress of child labor. After delivery she complained of pain and discomfort and said she had had severe cramping after the birth of a previous child. Such symptoms are not unusual in postpartum patients.

Mrs. Foley's normal blood pressure on admission was 112 over 80. Normal pulse is 64, normal temperature, 98.6 degrees, and normal respiration, 16 to 18 per minute. These elements are regarded as vital signs. Five hours after delivery, Mrs. Foley's blood pressure was 110 over 70, her pulse 126, her temperature 102.2, and her respiration 28. At this time the intern was sent for to check Mrs. Foley. The evidence of the nurse and the intern is conflicting as to whether he actually saw her and made such check. Aspirin was given to reduce the temperature which then dropped to normal, 12 hours after delivery. Codeine was given, and ice applied to the lower abdomen, to control pain. The codeine and ice were administered contrary to the orders of the attending physician. The physician also ordered that a blood count be taken within 24 hours of admission. This was not taken until 32 hours after admission and after her condition had become critical.

One of the hospital rules provides: "The patient must be observed closely by an experienced nurse, interne, or physician for uterine relaxation, hemorrhage, elevation or drop in blood pressure or pulse, and other symptoms of complications." Another rule provides in part as follows: "The interne shall immediately examine a patient when he is notified of any unusual occurrence or change in the patient's condition. He shall notify the attending physician of any significant change. This applies to all antepartum, intrapartum, and postpartum patients. In the event that the attending physician is not immediately available to receive a report of a change in condition of a patient, the interne shall follow orders at present existing in the department. He shall notify

the attending physician, as soon as possible, of the occurrence and what treatment the interne ordered for the patient." The intern stated in his subsequent report that apparently Mrs. Foley "did quite well until approximately seven-thirty p.m." on her first day in the hospital. He apparently recognized that there was a change in her condition at that time yet he failed to call her attending physician. In this regard, one of the attending nurses testified that at that time, following postpartum, a temperature of 102 and a pulse of 126 constituted an unusual occurrence, one not out of the ordinary, but one which good nursing practice would require notifying the attending physician.

Plaintiff's medical expert attributes her death to the failure to obtain a history indicating she had a cold, the failure to do anything more than administer aspirin at 7:30 p.m. on August 20, 1964, wher her temperature, pulse, and respiration increased, failure to notify the attending physician, and the administering of codeine and ice. Had she received proper care at that time (7:30 p.m.), the infection could have been overcome with antibiotics. He concedes that antibiotics should not be administered until a diagnosis is made and that the several doctors present on the morning of August 21 could not be criticized for failure to diagnose her condition until an exploratory operation was performed that afternoon.

Evidence of the degree of care, skill, and diligence common to hospitals in the Omaha community consisted of the introduction of the rules of the defendant hospital and a statement by its administrator that they represented the standard of care to be expected in the defendant hospital. Also, that such standard of care was "as good as the other standards of care" in Omaha hospitals.

A jury might reasonably infer that had Mrs. Foley's condition been properly treated at 7:30 p.m. on August 20, 1964, her infection could have been successfully com-

bated and her life saved. It might also reasonably infer that had a history been promptly taken on her admission to the hospital for the purposes contemplated by its rules, her cold and throat condition would have been discovered and the hospital personnel alerted to watch for possible complications of the nature she later developed. Quite possibly this would also have helped in diagnosing her condition, especially had it been apparent that she was subject to a "strep" throat condition.

Plaintiff and defendant agree that the proper measure of the duty of a hospital to a patient is the exercise of that degree of care, skill, and diligence used by hospitals generally in the community where the hospital is located or in similar communities. Although there are some exceptional situations in which the rule has been held not to be applicable, it is the general rule followed in the great majority of jurisdictions. See, Garfield Memorial Hospital v. Marshall, 204 F. 2d 721, 37 A. L. R. 2d 1270; 40 Am. Jur. 2d, Hospitals and Asylums, § 26, p. 869; Restatement, Torts 2d, § 299A, p. 73. Standards and regulations fixed by the state Department of Health and by such organizations as the American Hospital Association may well be pertinent on this issue, also, the standards, rules, and regulations of the defendant hospital and of other hospitals in the same or similar communities. Proof of a violation of such standards or regulations is not conclusive on the question of negligence, but is simply evidence of negligence. See Darling v. Charleston Community Memorial Hospital, 33 Ill. 2d 326, 211 N. E. 2d 253, 14 A. L. R. 3d 860.

In this case the evidence regarding standards of care prevailing in Omaha or similar communities consists primarily of the rules and regulations of the defendant hospital. This does not establish community standards which may be either more liberal or stricter than the standards set up by defendant. Although pertinent, such evidence standing alone is insufficient. In addition, plaintiff's medical expert testified that the practice of

obtaining histories was followed in all hospitals and one of defendant's nurses testified that the condition of Mrs. Foley at 7:30 p.m. on her first day in the hospital was such that good nursing practice required notification of the attending physician. Although this evidence is of a minimal nature, we believe it is sufficient to require the question of standards to be submitted to the jury.

In view of the failure to take a medical history of Mrs. Foley and of the failure to discover the infection until too late to combat it, other questions are presented. Had the history been taken and knowledge of the sore throat condition obtained, would the infection have been diagnosed in time to save her life? Plaintiff's expert answers this in the affirmative. Is it the responsibility of the hospital to guard against only known conditions or also against conditions which it should reasonably be expected to discover? The general rule is that a patient is entitled to such reasonable care and attention as her *known* mental and physical condition may require. See 40 Am. Jur. 2d, Hospitals and Asylums, § 26, p. 869. Nebraska has heretofore subscribed to this rule. See Wetzel v. Omaha Maternity & General Hospital Assn., 96 Neb. 636, 148 N. W. 582. Under such a rule, a simple denial of knowledge of a patient's condition will frequently provide a good defense. It also promotes carelessness as the less a hospital knows about a patient's condition, the safer it is against charges of negligence.

There is a minority rule which holds that a hospital must guard, not only against *known* physical and mental conditions of patients, but also against such conditions as it should have discovered by the exercise of reasonable care. See, Maki v. Murray Hospital, 91 Mont. 251, 7 P. 2d 228; Vick v. Methodist Evangelical Hospital, Inc. (Ky. App.), 408 S. W. 2d 428; Quick v. Benedictine Sisters Hospital Assn., 257 Minn. 470, 102 N. W. 2d 36. The minority rule is the rule generally followed in the law of negligence. The majority rule applied in hospital cases is an exception to the general law of negligence. In

Darling v. Charleston Community Memorial Hospital, *supra*, it is stated: " '* * * in negligence cases, the duty is always the same, to conform to the legal standard of reasonable conduct in the light of the apparent risk. What the defendant must do, or must not do, is a question of the standard of conduct required to satisfy the duty.' " See, also, Prosser on Torts (3d Ed.), § 53, p. 331. Hospitals now employ medical students, interns, and resident physicians and surgeons. The evidence discloses that it is customary for these employees to take a medical history of patients on admission for the purpose of protecting the patient and guarding against complications. This means taking the history before surgery, delivery, or treatment, not afterwards when it may be too late. We adopt the minority rule and over-rule any prior conflicting Nebraska decisions. A jury question was presented.

The judgment of the district court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.