Betty Colleen KASTLER, Appellant,

v.

IOWA METHODIST HOSPITAL, Appellee.

No. 53668.

Supreme Court of Iowa.

Dec. 15, 1971.

Reynoldson, Brown & Van Werden, Osceola, for appellant.

Patterson, Lorentzen, Duffield, Timmons & Irish, Des Moines, for appellee.

UHLENHOPP, Justice.

The principal question to be decided here is whether a hospital patient generated a jury issue on the question of negligence in this action against the hospital for personal injuries.

Plaintiff Betty Colleen Kastler, 25 at the time of the events in question, is married to Howard Kastler and lives on a farm near Van Wert, Iowa. Viewing the evidence in the light most favorable to Mrs. Kastler, the jury could find that from childhood she suffered from spells of headaches, rapid heartbeat, difficult breathing, and dizziness, followed by fainting. The spells grew worse after she became an adult. At the onset of a spell, she either got to, or was carried to, a bed or cot, and her head rolled from one side to the other. After she regained consciousness she was depressed and wept. Someone in the family stayed near her during her spells.

Mrs. Kastler received treatment in the form of medication from both Des Moines and Leon physicians, but she obtained no relief. In October of 1964 her difficulty became so severe that she and her family decided she should be hospitalized. Her physician contacted a Des Moines psychiatrist, who had her admitted to the psychiatric ward of defendant Iowa Methodist Hospital. A history was not taken by the admitting psychiatrist or entered on her chart until after the incident in question.

Mrs. Kastler entered the hospital on the afternoon of October 23, 1964. The psychiatrist directed that his standing orders should be followed, but he did not examine her until after the incident. His standing orders contained no reference to baths. The hospital regulations for hospital personnel contained directions for showers of patients at 9:00 p. m. daily.

Upon Mrs. Kastler's admission, her husband reported to the nurse on duty that Mrs. Kastler suffered from nerve trouble and fainting spells.

The evidence reveals that Mrs. Kastler is a cooperative and well-meaning individual and that in the hospital ward she was obedient and tried to follow hospital rules.

Mrs. Kastler spent October 24th in the ward. On the morning of October 25th she did not feel at all well, was dizzy, and felt "in general sick all over." She tried to do her personal laundry but could not complete it; another patient did it for her. As to her condition she testified, "I had tried to tell the nurse that was in the nurse's station, tried to talk to her but all I done, the only way I could get her attention was peck on the window and what I would say was ignored, so I didn't get to talk to her."

That noon Mrs. Kastler attempted to eat lunch but was unable to do so.

The nurses and aides change shifts at 3:00 p. m., and the outgoing shift reported to the incoming one that Mrs. Kastler was not feeling well.

Later in the afternoon of October 25th, Mrs. Kastler tried to play bingo, but she was too ill to do so. She asked the aide on duty if she could lie down because she was "so sick." She was allowed to do so. Later the aide came in and asked her how she was. Mrs. Kastler testified, "I explained to her that I had—I got dizzy and sick and my heart beat rapidly. . . ." The aide suggested the cause might be excitement, but Mrs. Kastler responded in the

negative and that "I had these spells, that I had these spells."

About time for the evening meal Mrs. Kastler got up. She was unable to take food, and when the aide made inquiry Mrs. Kastler responded she was just so sick she could not eat. She testified, "I was feeling terrible at that time. I just felt like I had before, dizzy and light-headed, sick to my stomach and that surely I just wanted to get laid down and rest."

The time for patients' showers came at 9:00 p. m. The area for female patients consists of a rectangular room containing lavatories and toilets, with an adjoining rectangular shower room containing the shower stall itself and an entry space to the shower. The female patients are individually called to the shower room by the aide on duty—in this case, the same aide with whom Mrs. Kastler had been conversing earlier. The aide sits just outside the shower room. The aide gave Mrs. Kastler an early number for her shower. At the trial the aide was asked:

Q. Was there any particular reason why she would have been that number? A. Because as I have told you before, it was reported she was not feeling well.

The aide sent Mrs. Kastler into the shower room alone. The jury could find that Mrs. Kastler was about ten feet from the aide when she took off her clothing to shower. According to Mrs. Kastler, she next stepped into the shower and started washing her face. At that point she lost consciousness and fell, striking the side of her face on the shower wall. She then fell face down on the floor. The aide contends she tried to clutch Mrs. Kastler, but of course the truth of the aide's testimony was for the jury. As a result of the fall, Mrs. Kastler's lip was severely lacerated, her jaw was broken, and two of her teeth were knocked out—all of her upper teeth had to be removed later in consequence of injury from the fall.

Mrs. Kastler bled from the mouth, and the aide placed a washcloth in her mouth and covered her with a bath mat. In a short time Mrs. Kastler regained consciousness, and in due course she received treatment for her injuries.

The psychiatrist later examined Mrs. Kastler. He was of the opinion that she has epilepsy and that she had a seizure in the shower.

Sometime later Mrs. Kastler left defendant hospital and entered a hospital at Leon, Iowa. Still later she was a voluntary patient at the Iowa Mental Health Institute at Clarinda.

Mrs. Kastler commenced an action against Iowa Methodist Hospital for her injuries from the fall. The case was tried to a jury. At the conclusion of the evidence, the hospital moved for a directed verdict, mainly on the grounds of no proof of negligence or of proximate cause. The trial court stated, "The Court, however, is constrained to view the testimony that's been introduced in this case in the light most favorable to the plaintiff in determining whether or not a jury question has been generated. Viewing the testimony in this light, and in the light of the decisions of the Supreme Court of Iowa in two recent cases, namely, the Bradshaw and Shover cases, the Court is constrained to overrule the defendant's motion for directed verdict."

The jury returned a verdict for Mrs. Kastler. The hospital moved for judgment notwithstanding verdict. The trial court, concluding that the motion was good, sustained it. Mrs. Kastler appealed the case to us.

Two issues are before us: whether substantial evidence was introduced as to (1) the negligence of the hospital and (2) proximate cause.

I. *Negligence.* The first issue contains three parts: (a) whether the duty of the hospital was to exercise "reasonable care in the light of the patient's known condition" or "the care exercised by hospitals generally," (b) whether evidence of the

practice of hospitals generally was necessary in this case, and (c) whether Mrs. Kastler adduced substantial proof that defendant hospital breached its duty toward her.

(a) As to the standard of care of a hospital toward a patient, two rules are frequently enunciated. A host of decisions hold that a hospital must use the care which is exercised by hospitals generally (or by hospitals in the community). We recently so held in a case involving professional services by a hospital. Dickinson v. Mailliard, 175 N.W.2d 588, 596–597 (Iowa) ("The correct standard of care to which hospitals should be held is that which obtains in hospitals generally"); see also, Garfield Memorial Hosp. v. Marshall, 92 U.S.App.D.C. 234, 204 F.2d 721 (D.C. Cir.); Foley v. Bishop Clarkson Memorial Hosp., 185 Neb. 89, 173 N.W.2d 881; Annot., 37 A.L.R.2d 1285. On the other hand, a host of other decisions hold that the standard applicable to hospitals is such reasonable care as the patient's known condition may require. E. g., Schuster v. St. Vincent Hosp., 45 Wis.2d 135, 172 N.W.2d 421; see also, Annots., 22 A.L.R. 341, 343, 39 A.L.R. 1431, 1432, 124 A.L.R. 186, 187, 11 A.L.R.2d 751, 778, 70 A.L.R.2d 347, 348, 378, 72 A.L.R.2d 408, 409. Standard treatises lump the two rules together. 40 Am. Jur.2d Hospitals & Asylums § 26 at 869 ("that degree of care, skill, and diligence used by hospitals generally in the community" and "such reasonable care and attention for their safety as their mental and physical condition, if known, may require"); 41 C.J.S. Hospitals § 8(3) at 349 ("such reasonable care toward a patient as his known condition may require" and "that degree of care, skill, and diligence used by hospitals generally in that community").

By an exercise in sophistry, possibly the two rules can be made to mean the same thing, but one court has pointed out that they are actually different rules. White v. Baptist Memorial Hosp., 363 F.2d 37 (6th Cir.). In that case the court was not required to resolve the problem.

Several courts, however, confronted by the problem, have held that the two rules are not identical but that they apply to two different situations. If the conduct in question is professional in nature, then the applicable standard is the care exercised by hospitals generally (or by hospitals in the community). But if the conduct involves nonmedical, administrative, ministerial, or routine care, then the applicable rule is such reasonable care as the patient's known condition may require. Perhaps the earliest case clearly drawing the distinction is Hayhurst v. Boyd Hosp., 43 Idaho 661, 254 P. 528. Other decisions making the distinction are Gold v. Sinai Hosp. of Detroit, 5 Mich.App. 368, 146 N.W.2d 723; Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743; Bennett v. Punton Sanitarium Ass'n, 213 Mo.App. 363, 249 S.W. 666; Duling v. Bluefield Sanitarium, Inc., 149 W.Va. 567, 142 S.E.2d 754; Hogan v. Clarksburg Hosp. Co., 63 W.Va. 84, 59 S.E. 943 (epileptic sustained burns while unattended—court refused to apply standard of hospitals generally and applied standard of reasonable care for patient); Cramer v. Theda Clark Memorial Hosp., 45 Wis.2d 147, 149, 172 N.W.2d 427, 428 ("Courts generally make a distinction between medical care and custodial or routine hospital care."); Schuster v. St. Vincent Hosp., 45 Wis.2d 135, 172 N.W.2d 421; see also, Annot., 36 A.L.R.3d 454.

We think the distinction between the two classes of hospital services is a valid one which comports with negligence law generally. Under that law, the standard of conduct which ordinarily applies is the care "of a reasonable man under like circumstances." Restatement, Torts 2d § 283. But in the practice of a profession or trade, the standard is "the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Id., § 299A. With respect to professional activities of

hospitals, we adhere to our rule that the standard is the care "which obtains in hospitals generally under similar circumstances." Dickinson v. Mailliard, 175 N. W.2d 588, 596 (Iowa). In accordance with the authorities we have cited, however, with respect to nonmedical, administrative, ministerial, or routine care, we adopt the rule that the standard is such reasonable care for patients as their known mental and physical condition may require. We will not at this time attempt to formulate a precise distinction between the two kinds of activities. We think the cited authorities make clear that the activity in the present case—showers of patients—was routine care. We believe too that such showers did not lose their character as routine care because they were employed to make the psychiatric patients feel better. The character of a particular activity of a hospital—whether professional, on the one hand, or nonmedical, administrative, ministerial, or routine care, on the other—is determined by the nature of the activity itself, not by its purpose. We thus hold that the hospital here, in giving patients showers, was required to use such reasonable care as their known mental and physical condition required, whether the showers were given to make the patients feel better or to keep them clean or both.

■ (b) Our adoption of the reasonable care rule for the present case means that Mrs. Kastler was not required to adduce proof of the practice of hospitals generally respecting showers or to introduce expert testimony. The jury could use its own knowledge and good sense with respect to the hospital's conduct in question. This aspect of the case was discussed in Cramer v. Theda Clark Memorial Hosp., 45 Wis.2d 147, 150, 172 N.W.2d 427, 428 ("the jury is competent from its own experience to determine and apply such a reasonable-care standard"). See also, Gold v. Sinai Hosp. of Detroit, 5 Mich.App. 368, 146 N.W.2d 723; Stallman v. Robinson, 364 Mo. 275, 260 S.W.2d 743; Bennett v. Punton Sanitarium Ass'n, 213 Mo.App. 363, 249 S.W.

666; Annot., 40 A.L.R.3d 515, 523–27, 542–45, 547–52.

■ (c) As to the sufficiency of the evidence which was introduced on negligence, given the facts previously recited, we believe Mrs. Kastler made a case for the jury. Under the decisions cited, one of the important circumstances is the patient's known condition. Here the patient suffered fainting spells, and the hospital was so informed. On the very day of the incident the patient was ill; the hospital was informed of that too, through its employees. We cannot say all reasonable minds would agree on the negligence issue; hence it was for the jury. In addition to the cases previously cited, see Crawford W. Long Memorial Hosp. v. Hardeman, 84 Ga.App. 300, 66 S.E.2d 63; Elliott v. Tempkin, 32 App.Div.2d 531, 299 N.Y.S.2d 857. See also, Annot., 36 A.L.R.3d 1235.

The hospital contends, however, that the admitting psychiatrist left his standing orders for the patient, that those orders did not forbid showers, and that the hospital could therefore follow its routine, including showers.

The jury could find that the psychiatrist did not obtain a history at the time of Mrs. Kastler's admission, that the chart disclosed no history, and indeed that the hospital personnel knew more about the fainting spells than the psychiatrist, up to the time of the fall. For over two days the hospital had the patient in its care. All of the day of the injury the patient was ill and she told hospital personnel about her trouble.

■ Doctors' orders do not insulate hospitals from liability if subsequent circumstances show need for change or action, in the exercise of reasonable care. That problem was involved in Mundt v. Alta Bates Hosp., 223 Cal.App.2d 413, 35 Cal. Rptr. 848. There the physician left the patient with a fluid flowing into her leg intravenously, with orders to continue the process. During subsequent changes in shifts of nurses, the nurses observed that

the leg was swelling but did not notify the patient's physician or any other physician until the leg was swollen to twice its normal size, resulting in injury. The court held the hospital could not simply rest on the physician's directions, saying:

This evidence was clearly sufficient to support a finding that the hospital nurses were derelict in their duty to observe the condition of respondent's leg and promptly report all unfavorable symptoms to the doctor in charge. 223 Cal. App.2d at 423, 35 Cal.Rptr. at 854.

See also, Goff v. Doctors General Hosp. of San Jose, 166 Cal.App.2d 314, 319, 333 P.2d 29, 33 (nurses believed physician insufficiently sutured patient—"Both nurses had enough time to have reported the facts and circumstances of Mrs. Goff's peril to a superior in the hospital corporation with the purpose that prompt and adequate measures be taken to safeguard the life of Mrs. Goff."); Norton v. Argonaut Ins. Co., 144 So.2d 249 (La.App.) (doctor's orders unclear but nurses failed to contact him).

We think the circumstance of this psychiatrist's direction to follow his standing orders, given at the time of Mrs. Kastler's admission two days before the injury, did not as a matter of law overcome Mrs. Kastler's prima facie case of negligence. The issue was for the jury to resolve.

■ II. *Proximate Cause.* Once a case is made on negligence, the issue of whether the negligence proximately caused the injury is ordinarily for the jury. Rule 344(f) (10), Rules of Civil Procedure.

The proximate cause principle is stated thus in Restatement, Torts 2d § 431:

The actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the

manner in which his negligence has resulted in the harm.

■ Viewing Mrs. Kastler's evidence in its most favorable light, we think the jury could find that the action of the hospital in having her take a shower without an aide in immediate attendance, in her known ill condition and proclivity to fainting spells, was a substantial factor in bringing about the fall. At least, we cannot say that all reasonable minds would agree that the fall was not a proximate consequence of the negligence. Hence this issue, too, was properly submitted to the jury.

We hold the trial court was right when it ruled at the conclusion of the evidence that plaintiff's case was for the jury, but that it fell into error when it sustained the motion notwithstanding verdict. The verdict must be reinstated and judgment must be entered thereon.

Reversed.

All Justices concur except MOORE, C. J., and LeGRAND, J., who dissent, and REYNOLDSON, J., who takes no part.

MOORE, Chief Justice.

I dissent.

I. These additional facts must also be considered. After arrangements were made on Friday, October 23, 1964 for plaintiff's admittance to the psychiatric ward of defendant hospital she visited relatives and at 4:00 p. m. went with her husband to the sixth floor of the hospital and was duly admitted as a patient.

Mr. Kastler was questioned by registered nurse Norma Davis just outside the locked door to the ward where he related a several year history of plaintiff's fainting spells. The nurse's testimony includes:

"Q. And what did he say, what did you say? A. I don't recall what I specifically said, but it came out that she had fainting spells, that she seemed to realize something was going to happen, she always

made it to a chair and was able to sit down, was never hurt.

"I specifically asked Mr. Kastler if she ever hurt herself and he said that she had never hurt herself. She was ambulatory when she came in. This is not a medical ward. Medical patients are transferred from the ward if they require extended bed care. There is bed care that is required as a result of psychiatric treatment and in particular shock treatment. Patients like this who are confined to bed would probably take a shower because they usually feel better and more relaxed after a shower. The showers are therapeutic. They are a help to us. I don't take showers with the patients that make use of the psychiatric facilities or go into the shower room with them and actually hold them up. They are encouraged to take showers on their own. There is not a bath available. They could take a sponge bath. There was no history given me either by the patient or by the husband or by the doctor of any seizures or grand mal seizures of any sort. It is my obligation to try to keep things normal in the ward as nearly as possible and to have them mix in society.

"All of the longhand writing on page 34 of the hospital records is mine. I am reading from that page as follows, 'white 25 year old female with brown hair and eyes. Admitted ambulatory toward South 6 accompanied by her husband. Entered ward cooperatively but was tearful. Gait normal. Speech vibrant and coherent. Sensorium seems intact. Insight and judgment seem adequate. Attention and retention good. Recent and remote memory adequate. Husband states patient has been depressed off and on for four years and saw Dr. Haines in 1959. She has had fainting spells for many years. The last three or four years she appears to have an aura and cries a lot after waking up. Recently the spells have changed in that she does not pass clear out. The last one was two or three weeks ago. Since then she has had almost a constant headache and the last two or three days it has been more severe and she has had difficulty sleeping and eating. She has been depressed and cries easily.' "

Dr. Cash's secretary had advised Mrs. Davis the standing orders were to be followed. On admittance plaintiff was taken to her room where an aide took her temperature, pulse and respiration. She was then shown around and oriented to the ward used by a total of about 24 patients. The routine of the ward was explained to her including activities with other patients, meal time and that she was expected to take a shower each night at about 9:00 p.m. Soon after admittance plaintiff took a shower which was not repeated that evening. That evening she socialized with other patients including dancing with one of them.

The next day, Saturday, plaintiff socialized with other patients, watched TV, took her scheduled meals and a shower that evening.

When plaintiff arose Sunday morning, the accident date, she felt dizzy and generally sick all over. With help of another patient plaintiff did her laundry and then wrote a letter to her husband. She testified she attempted to talk to the nurse at the nurses' station but was ignored. That afternoon she played bingo but became sick and did not finish the game. A nurse gave her permission to lie down and advised plaintiff her illness was due perhaps to excitement.

Plaintiff that Sunday evening at the usual shower time went to the shower room and waited her turn. Plaintiff testified she understood a shower was required. In the shower she became sick, fell and was injured. She had made no complaint to the shower attendant who was a few feet from her. Later she stated she had never before had such a sudden black out seizure. Dr. Cash opined she had a grand mal epileptic seizure.

The trial court submitted these two pleaded specifications of negligence to the jury.

"a. In leaving plaintiff unattended and unobserved in plaintiff's physical and mental condition and under the circumstances then existing.

"b. In requiring plaintiff to take a shower bath when defendant knew or in the exercise of reasonable care should have known, of the danger to the plaintiff under the conditions then existing."

In instruction 9 the trial court told the jury:

"You are instructed that it was the duty of the Iowa Methodist Hospital to give Betty Colleen Kastler such reasonable care and attention as it knew, or in the exercising of reasonable care should have known, her condition required. *This duty is measured by the degree of care, skill and diligence customarily exercised by hospitals.*

"A failure of the Iowa Methodist Hospital to render such ordinary care and attention to Betty Colleen Kastler would be negligence.

"However, the Iowa Methodist Hospital was not an insurer of Betty Colleen Kastler's safety, and it was not required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen." (Emphasis added).

This statement of the applicable rule is almost verbatim with the form of instruction used in Bradshaw v. Iowa Methodist Hospital, 251 Iowa 375, 390, 101 N.W.2d 167, 176; Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 712, 107 N.W.2d 85, 88 and Dickinson v. Mailliard, Iowa, 175 N.W.2d 588, 595. See also Baker v. United States, 8 Cir., 343 F.2d 222, 225; 40 A.L.R.3d 515; 40 Am.Jur.2d, Hospitals and Asylums, section 26, which state the same general rule.

In each of the above cited Iowa cases plaintiff introduced evidence of the customary practice and care exercised by the hospital in the given circumstances and its failure to meet the stated standard of care.

The record before us discloses no such evidence and therefore the ruling of the trial court sustaining defendant's motion for judgment notwithstanding the verdict should be affirmed. But the majority would abandon or ignore the well established rule and adopt a rule applying against the hospital a duty under the fictional ordinary prudent man-reasonable care under the circumstances concept. This under the facts here would permit and require the jury to speculate and engage in guess work.

Under the doctor's standing orders it appears life in the psychiatric ward has a therapeutic design. Once admitted, patients are allowed no visitors for at least five weeks. Each is expected to be up and mingle with other patients during the daytime except a nap period from two to three p. m. Great stress is placed upon the scheduling of patients' lives and activities.

To encourage mingling with other patients many activities are scheduled. In her short stay plaintiff was exposed to bingo, a bowling game, ping pong and dancing. Time was set aside for television and reading. Plaintiff testified a shower made her feel better.

Thus the procedure and routine of the psychiatric ward can be seen as a treatment or therapy process of resocialization. Easing of tensions is the objective. It differs vastly from the procedure and routine in the ordinary medical ward.

Without evidentiary help the majority would cast aside our established rule and permit the jury to speculate as to the hospital's duty and any breach thereof. I cannot agree. What knowledge does a layman have of the proper care of a psychiatric ward patient?

The majority opinion states: "We will not at this time attempt to formulate a precise distinction between the two kinds of activities (professional or administrative)." Where does that leave the bench and bar in future cases? I would not change the

general rule as recognized and applied in Bradshaw, Shover and Dickinson.

II. If the majority opinion is to be adopted certainly the judgment should not be re-entered. At most plaintiff under this record would only be entitled to a new trial.

I would affirm.

LeGRAND, J., joins in this dissent.