George W. ROSE, Jr., an infant, by and through his father and next friend, George W. Rose and George W. Rose, Plaintiffs,

v.

Arcadius H. HAKIM and Weston Bruner, Jr., et al., Defendants.

Civ. A. No. 2132–68.

United States District Court, District of Columbia.

Nov. 10, 1971.

J. Joseph Barse, Washington, D. C., for plaintiffs.

Denver H. Graham, Washington, D. C., for Arcadius H. Hakim.

J. Harry Welch, Washington, D. C., for Associated Anesthesiologists.

John L. Laskey, Diane M. Sullivan, Washington, D. C., for Washington Hospital Center.

OPINION

WILLIAM B. JONES, District Judge.

By an amended complaint this medical malpractice action was brought by plaintiffs against Arcadius H. Hakim, an ear, nose and throat surgeon (Hakim), a number of physicians practicing medicine in partnership as anesthesiologists (Associated Anesthesiologists) and the Washington Hospital Center (Hospital). The plaintiffs are George W. Rose, Jr. (infant plaintiff) and his father George W. Rose (father plaintiff) who brought the action for and on behalf of the infant plaintiff as well as in his own behalf.

Before trial plaintiffs settled with and dismissed Hakim and Associated Anesthesiologists from the action. Plaintiffs thereafter proceeded to trial by the Court and jury of their action against Hospital. This resulted in jury verdicts in favor of the plaintiffs. Infant plaintiff was awarded $265,000.00 and father plaintiff was awarded $29,777.25.[1]

In their pleadings Hakim and Associated Anesthesiologists each cross-claimed against Hospital for indemnification or contribution.[2] Hospital cross-claimed against Hakim and Associated Anesthesiologists. In each instance the cross-claim was for indemnification. At pretrial it was stipulated by the parties that the cross-claims would be tried by the Court without a jury. At the commencement of the trial Hospital dismissed its cross-claim against Hakim.

The cross-claims were tried by the Court without the jury contemporaneously with the jury trial of plaintiffs' action against the Hospital. The jury was excused from the courtroom when evidence relating solely to the cross-claims was being received by the Court. At no time was the jury informed of either the amount or the fact that Hakim and Associated Anesthesiologists had settled with plaintiffs. Thus the Court has before it the evidence received out of the presence of the jury and the evidence received in the jury case.[3] From that evidence the Court finds the facts to be as follows.

Hakim is a private physician and surgeon who specializes in treating conditions affecting the ear, nose and throat. The father plaintiff employed Hakim to care for the infant plaintiff whose tonsils and adenoids were infected. For the purpose of surgically removing the tonsils and adenoids and correcting an inflamed condition of the middle ear, Hakim arranged for the infant plaintiff to be admitted to the Washington Hospital Center. On February 21, 1968, infant plaintiff, then a five year old boy, was admitted to the Hospital as Hakim's private patient. Before surgery Hospital personnel performed the required tests and made the appropriate physical examination of the infant plaintiff. The tests and examination disclosed no reason for not undertaking the planned surgery.

1. Hospital's counterclaim for the allegedly unpaid balance of infant plaintiff's hospital bill was not prosecuted. Hereafter in this opinion that claim of Hospital as well as its claim of credit on the verdict will be discussed.

2. When this action was originally filed plaintiffs did not include Hospital as a defendant. Hakim filed a third party complaint against Hospital for indemnification or contribution. Thereafter plaintiffs amended their complaint and added Hospital as a defendant. Cross-claiming against Hospital, Hakim's third party complaint was dismissed without prejudice.

3. No party has moved to strike any of the evidence presented to the jury.

Infant plaintiff was taken to Hospital's operating room where a medically acceptable general anesthetic was administered to him by Dr. Ho, a fellow in the Hospital's department of anesthesiology and an employee of Associated Anesthesiologists. The latter as a partnership had a contract with the Hospital to perform anesthesia services for the Washington Hospital Center. At about 1:25 P.M. on February 21, 1968, Hakim commenced the surgical procedures for the removal of infant plaintiff's tonsils and adenoids. In addition to the infant plaintiff, Hakim and Dr. Ho, there were present in the operating room instrument or scrub nurse Lewis and circulating nurse Bowman. Lewis and Bowman were employees of Hospital.

To perform the surgery Hakim placed himself at the head of the infant plaintiff and Dr. Ho stood at the side of the infant plaintiff. Several times during the surgery Hakim told Dr. Ho he needed more exposure, that is greater opportunity to see into the small oral cavity of the infant plaintiff. This needed exposure was made available to the surgeon. About three minutes before the completion of the tonsillectomy and adenoidectomy Hakim noticed the blood of infant plaintiff getting dark. He called upon the anesthesiologist, Dr. Ho, to administer oxygen. The blood lightened in color and Hakim continued with the surgery. Again the blood darkened and again Hakim requested Dr. Ho to administer more oxygen. The blood again lightened in color. Hakim saw the blood lightening and scrub nurse Lewis observed infant plaintiff's lips return to normal from a blue color. During this period of darkening and lightening in the color, the blood continued to spurt from capillary vessels in infant plaintiff's oral cavity which evidenced the fact that the heart was functioning.

As Hakim completed the tonsillectomy and adenoidectomy he positioned the infant plaintiff's head to perform a myringotomy, the surgical procedure to correct the ear involvement. At that time he asked circulating nurse Bowman to check the infant plaintiff's pulse. She did so and reported that he had no pulse. External cardiac pressure, pure oxygen by positive pressure squeeze bag and various drugs were immediately administered to resuscitate infant plaintiff. At the same time Hospital's emergency signal—"code blue"—was given. In response to that signal a number of other physicians went immediately to the operating room. Additional drugs were administered and a cardiac monitor was attached to infant plaintiff. Two and one-half minutes after nurse Bowman reported there was no pulse the infant plaintiff's heart beat resumed.

At 2:30 P.M. on February 21, 1968, following the return of infant plaintiff's heart beat, he was transferred to the recovery room. There Hakim ordered intravenous fluids and medication to drip at the rate of 50cc per hour, a reduction and maintenance of body temperature at 90° Fahrenheit through hypothermia, 12.5 grams of Manitol intravenously in a single dose, 22.3 milligrams of sodium bicarbonate and 600,000 units of Wycolline to be given daily. He also ordered that infant plaintiff's vital signs be checked, a blood chemistry examination be made, a record of urine output be maintained, an electroencephalogram be made and a neurological consultation be had. Later he gave an additional order for 10 milligrams of Hykenone to be given intravenously. All of this was in accord with proper medical practice.

Two hours after the cardiac arrest and in the recovery room infant plaintiff was examined in consultation by Dr. Hakim, Dr. Bruner, one of the Associated Anesthesiologists' partners, Dr. Hugo Rizzoli, the head of the Department of Neurosurgery at the Hospital, and Dr. Cooney and Dr. Koulouris, neurosurgery residents employed by Hospital. After examining infant plaintiff Dr. Rizzoli stated in his consultation note that it was his impression that infant plaintiff had experienced cerebral anoxia but that he believed he would recover. He recommended that hypothermia be continued. At trial Dr. Rizzoli explained his note

"will recover" meant infant plaintiff would survive in terms of life and death.

Sometime in the late afternoon or early evening of February 21, 1968, Hakim ordered infant plaintiff transferred to the intensive care unit of the Hospital. The exact time of the transfer was to be determined on the basis of infant plaintiff's condition by Dr. Shibuya, the anesthesiologist on duty the night of February 21–22, 1968, and who was with the infant plaintiff in the recovery room. Shibuya was one of the Associated Anesthesiologists' partners.

At 10:30 P.M. on February 21, 1968, Dr. Shibuya transferred infant plaintiff to the intensive care unit. At that time Shibuya was of the opinion that infant plaintiff was making a good recovery. Shibuya found him becoming more reactive and alert, breathing on his own and in a satisfactory physical condition. In Shibuya's opinion infant plaintiff would recover from the cardiac arrest in the operating room.

In anticipation of the transfer of infant plaintiff to the intensive care unit a nurse from that unit went to the recovery room prior to 10:30 P.M. to become informed of infant plaintiff's condition and to make arrangements for proper equipment and supplies for his care in the unit. But when infant plaintiff arrived in the unit the only resuscitator assigned to the intensive care unit either wasn't there, or if it was there it was broken and inoperative. Moreover, the unit did not have a glass thermometer that would register lower than 94° Fahrenheit temperature, although there were such thermometers elsewhere in the Hospital. The unit nurses knew or in the exercise of ordinary care should have known that Hakim's written orders called for maintaining infant plaintiff's temperature at 90° Fahrenheit. They also knew that the telethermometer, which was attached to the hypothermia machine (an apparatus to lower body temperature) was not always accurate. Furthermore, the intensive care unit either did not have, when needed for infant plaintiff, a heart monitor, with a de-fibrillator on it to shock the heart if it started to fail or to beat abnormally, or if it did have such a monitor it was not attached to the infant plaintiff.

When infant plaintiff arrived in the intensive care unit a nurse, an employee of the Hospital, was assigned to exclusively care for him. When the nursing staff changed at 11:00 P.M. February 21, 1968, this exclusive nursing arrangement was continued with another Hospital nurse being assigned. While the latter was a graduate nurse, she was not a registered nurse since she had passed only two of the subjects required to achieve that status. Neither at the time of her employment nor at any time prior to February 22, 1968, did any Hospital personnel ever inquire of her as to whether she was a registered nurse.

Following his arrival in the unit the infant plaintiff's temperature began to rise with accompanying minor convulsions every fifteen minutes. The temperature rise and small convulsions every fifteen minutes were observed and recorded by the unregistered nurse on duty between 11:00 P.M. February 21 to 7:30 A.M. February 22, 1968, but she did not notify Hakim of those facts nor did anyone else. Before Hakim left the Hospital in late afternoon or early evening of February 21, he notified the nurses where he could be located and that they were to call him if there were any questions. Moreover, Hakim's office and home telephone numbers were recorded and readily available for the nurses' use and this was known to the nursing staff. If Hakim had been called, he could have ordered various drugs to lower the temperature.

Following a cardiac arrest it is good medical practice to reduce and maintain the body temperature of the patient. Reduced temperature diminishes the demand of body tissues for oxygen, particularly the tissues of the brain and the myocardium of the heart. Increasing body temperature increases the brain's demand for oxygen and unless corrected will result in seizures or convulsions. It was to give the infant plaintiff's brain

and heart the rest needed after the cardiac arrest that Hakim in his first orders in the recovery room ordered hypothermia at 90° Fahrenheit.

Hypothermia as used and understood by Hakim and Hospital's employees is a mechanical cooling process consisting of a blanket placed on the patient. The blanket contained tubing through which cooling material circulated. The blanket was connected to a machine which caused the circulation of the cooling material. The machine may be set to operate automatically at the desired constant temperature and if working properly it maintains that temperature or a temperature within a permissible variable one-half degree. A telethermometer is a part of this equipment and through a tube records the temperature rectally. If in proper working condition, it records the actual body temperature.

Hypothermia was applied to infant plaintiff in the recovery room and by 6:20 P.M. the temperature was reduced to 90.5°. A different hypothermia machine was used in the intensive care unit and it did not function as it should as the temperature recordings by the nurses attested. However, it was not before 6:55 A.M. or 7:00 A.M. on February 22, that infant plaintiff's temperature was checked with a glass thermometer. A nurse took infant plaintiff's temperature with a glass thermometer which she borrowed from the Hospital's emergency room. By comparison she ascertained that the telethermometer was recording a temperature 4.6° lower than the actual temperature. The intensive care unit hypothermia machine telethermometer recorded the following temperatures: February 21, 10:30 P.M. 92°, 11:00 P.M. 91.5°, 12:00 midnight 92°, February 22, 1:00 A.M. 93.5°, 1:30 A.M. 95.4°, while in fact each was 4.6° higher. And it was at 1:45 A.M. that infant plaintiff had the first of three grand mal convulsions.

The attending nurse, upon noting the rising temperature during the night, did not give him aspirin, or increase the intravenous medication he was receiving, or pack him in ice, or sponge the infant plaintiff with alcohol. All of those things she should and could have done for her patient without further orders from a doctor. Her failure to do so failed to meet the standard of good nursing practice.

Not only did the temperature chart indicate that the hypothermia machine telethermometer was not working properly, but also the nursing staff in the intensive care unit knew that the telethermometer did not always accurately record the true temperature. Possessing such knowledge good nursing practice required checking the accuracy of the telethermometer with a glass thermometer long before the grand mal seizure of 1:45 A.M. February 22. Nor was it good nursing practice to permit infant plaintiff's temperature rise to 95.4° as recorded by the malfunctioning telethermometer when the doctor's orders were to maintain it at 90°.

At 1:45 A.M. on February 22, 1968, the assigned nurse was checking infant plaintiff's vital signs when he had a grand mal convulsion and stopped breathing. There was no resuscitator available in the intensive care unit and a nurse gave mouth to tube resuscitation for a period of 10 to 15 minutes until a Bird respirator was brought from the Hospital's inhalation therapy unit and connected to infant plaintiff. During the mouth to tube resuscitation the nurse applying it noted infant plaintiff's pulse beats. Again at 3:30 A.M. and then at 5:20 A.M. on February 22, 1968, he had grand mal convulsions. At 6:50 A.M. of that day the nurse assigned to infant plaintiff noted that he was not getting proper air exchange, that is he was being deprived of the necessary amount of oxygen. She called the inhalation therapy unit. A member of that unit arrived at 7 A.M. and discovered an obvious kink in one of the tubes of the Bird respirator and corrected it.

Hakim was not notified of any of the three grand mal convulsions or the respirator problem. He first learned of those changes in the patient's condition when the physician in charge of the ear,

nose and throat department of the Hospital called him later in the morning. At that time he was advised that the infant plaintiff had been transferred to the care of the Hospital's department of neurosurgery since his problems were no longer of the ear, nose and throat category.

From within two and one-half minutes after the cardiac arrest in the operating room until the first grand mal convulsion at 1:45 A.M. on February 22, 1968, infant plaintiff was able to breathe for himself. Commencing with the first grand mal convulsion infant plaintiff was unable to do his own breathing. The hospital chart maintained by the nursing staff records no breathing—respiration —by infant plaintiff between 1:45 A.M., the time of the first grand mal convulsion, and 2:10 A.M. on February 22. Nor was any respiration recorded for 7:15 A.M., the approximate time of the kinking of the tube in the respirator. The Bird respirator had to perform or assist his breathing for some considerable period of time. It was not until April 18, 1968, and thereafter that the respirator was no longer used at any time to breathe for him or to assist him in breathing. During the ten minutes that the respirator was malfunctioning on February 22, 1968, in the intensive care unit because of the kink in the tube, plaintiff's brain was deprived of needed oxygen which resulted in increased anoxia.

■ Contrary to good hospital practice, Hospital failed to keep or to preserve neurological response charts in the intensive care unit from the time infant plaintiff arrived there at 10:30 P.M. February 21. The first record of neurological responses produced by Hospital was a February 22, 9 A.M. notation. However, one of the Hospital's neurosurgeon residents reported in the consultation record that infant plaintiff had suffered a cardiac arrest during the night of February 22, 1968, as did the Hospital's cardiologist in another consultation record. The latter stated that he recorded a second cardiac arrest after conferring at about 12:30 P.M. on February

22, 1968, with a nurse, or a resident or an intern directly connected with infant plaintiff's case. But at the time he testified at trial he believed, even though he recorded otherwise, that there was not a second cardiac arrest during the night or early morning hours of February 22. On cross-examination Dr. Manchester was referred to a consultation note made by Dr. William Lyons, a thoracic surgeon. On February 22, Dr. Lyons had been called to perform a tracheostomy to replace the endotracheal tube which had been inserted in infant plaintiff. His note read: "There had been some mechanical difficulties in ventilating with the endotracheal tube and a period of hypoxia had occurred this A.M." Dr. Manchester admitted that the recorded "period of hypoxia" could be a cause of a cardiac arrest. "Hypoxia" as defined by Dr. Lyons means a condition of decreased oxygen in the blood. The mechanical difficulties Dr. Lyons referred to were reported to him by Hospital's personnel and were encountered while infant plaintiff was on the Bird respirator during early morning hours of February 22.

The general nursing record which advised the nurses of Hakim's home and office telephone numbers, also ordered the nurses to record neurological signs. But as noted no such record was kept prior to 9:00 A.M. on February 22, 1968, notwithstanding what had transpired with respect to the condition of infant plaintiff from the preceding midnight. All who testified with respect to the significance of such signs acknowledged that they were of the utmost importance to physicians. The recording of them by nurses was the means of communicating such information to the physician. Not to keep such a record was recognized as a failure to conform to the standard of good nursing practice.

Decerebrate movements are neurological signs and should be recorded when observed. The first time decerebrate movements of infant plaintiff were recorded was on February 26, 1968, at 4:00 A.M. Notwithstanding that first entry of such movements, two nurses at

trial testified that they observed infant plaintiff's decerebrate movements in the recovery room the evening of February 21, 1968. But they made no record of such movements nor did they by any other means notify any physician of them. Moreover, one of the nurses who so testified was the nurse in charge of the intensive care unit until 11:00 P.M. on February 21. She stated that she had gone to the recovery room to ascertain what equipment and medication would be required for infant plaintiff when he was moved to her unit. But she did not requisition a respirator or an operable cardiac monitor. Nor did she advise any of her fellow nurses in her unit of decerebrate movements. In light of the recognized importance of recording decerebrate movements and of preparing to contend with the possible consequences of such signs and the failure to take such precautions I reject as unworthy of belief the testimony of the two nurses that they had observed such movements.

Infant plaintiff has suffered permanent brain damage. As a result, although he can see some light, he is cortically blind and will remain so for the rest of his life. He will never be able to read nor will he ever be able to learn through the Braille system. The nerves in his right hand have been so affected that he does not have the sense of touch in that hand required to utilize the Braille system. His mind is functioning well and he must learn whatever he can through listening.

In his upper extremities his functional accomplishments are those of a thirteen month old infant, while the accomplishments of his lower extremities are those of a six month old baby. He is and will be totally dependent on others throughout the balance of his life. The permanent brain damage has not shortened his life expectancy. A non white male age eight years, as is infant plaintiff, has a 55.9 years expectancy.

■ There is no evidence in this case that either Hakim or any one of the Associated Anesthesiologists or Dr. Ho was negligent at or before the happening of the cardiac arrest in the operating room. A cardiac arrest during surgery is in itself no evidence of negligence. That cardiac arrests do happen during surgery without negligence is a fact recognized by the medical profession. While cardiac arrests fortunately are not every day happenings they are not so rare that they are unheard of in hospitals. Defendant Hospital has an alarm system to meet such emergencies during surgery. It is known in the Hospital as the "code blue" signal which when sounded calls all available doctors to the operating room to render assistance. Dr. Jenkins, the director of Hospital's department of neurology and its employees, during his testimony volunteered the information that for the year 1964–1965 there were more than 173 cardiac arrests at defendant Hospital, and he estimated that for the years 1964 through 1970 there were more than 1,000 such arrests. Moreover, Dr. Jenkins testified that many people have cardiac arrests without suffering permanent brain damage; that the fact of a cardiac arrest does not automatically mean permanent brain damage; that a cardiac arrest may cause a neurological injury or insult which is reversible.

■ I find that the permanent brain damage which the infant plaintiff suffered was not caused by the cardiac arrest in the operating room. At most that arrest resulted in a neurological injury or insult which was reversible and Hakim, Associated Anesthesiologists and Dr. Ho were in no way at fault for that arrest or injury.

The permanent brain damage with which infant plaintiff must live for the rest of his life was proximately caused by Hospital through the negligent acts and omissions of its employees and the defective equipment utilized in the care of the infant plaintiff in the intensive care unit from the time he was moved there on the night of February 21 until sometime after 7:00 A.M. February 22, 1968. I have heretofore detailed and described those negligent acts and omissions and that equipment.

I am supported in my findings by the medical testimony adduced at the trial. In accord with the testimony of other experts, those called by the Hospital expressed the opinion on cross-examination that the cardiac arrest in the operating room could not have been the producing cause of the permanent brain damage when it was made known to those experts that the arrest lasted only two and one-half minutes. Typical of their testimony is that of Dr. Manchester, a cardiologist. He stated that one would have to look elsewhere for the cause of permanent brain damage if the cardiac arrest was only two and one-half minutes in duration.

That the time interval of the arrest was two and one-half minutes was made abundantly clear by Hakim. He had been observing the blood spurting from the oral cavity capillaries—evidence that the heart was functioning. As he was about to turn infant plaintiff's head for the myringotomy he asked the nurse to check infant plaintiff's pulse. She responded immediately that there was no pulse. Hakim at once looked at the wall clock with a large operating second hand. Cardiac massage was immediately commenced and the other emergency measures were instituted. When the heart action started again the clock on the wall showed that it was two and one-half minutes later. There has been no evidence in this case to controvert that time period.

Dr. Jenkins, Hospital's department of neurology director, had trouble with the two and one-half minute cardiac arrest. He could not or would not accept that fact. He preferred to think of the arrest being more severe than was shown by the facts recorded in the Hospital records. But even he had to "believe * * but not necessarily" that the convulsions in the intensive care unit "may have contributed to his [infant plaintiff's] present state * * *."

The jury in this case properly found Hospital negligent and that its negligence was the proximate cause of infant plaintiff's permanent brain damage. As has been held many times, a hospital is liable for the negligence of its servants and for defective equipment. Alden v. Providence Hospital, 127 U.S. App.D.C. 214, 382 F.2d 163 (1967); Garfield Memorial Hospital v. Marshall, 92 U.S.App.D.C. 234, 204 F.2d 721 (1953); Hord v. National Homeopathic Hospital, 102 F.Supp. 792 (D.C.1952), aff'd sub nom. National Homeopathic Hospital v. Hord, 92 U.S.App.D.C. 204, 204 F.2d 397 (1953).

I find that Hakim and Associated Anesthesiologists, including Dr. Ho, were not negligent and did not contribute to infant plaintiff's permanent brain damage.

*Hospital's Cross-Claims*

1. During the pleading stage and throughout the pre-trial conferences of this case, Hospital was asserting, by way of a cross-claim against Hakim, that if it were in any way found liable to the plaintiffs in this action it had a right to indemnification by Hakim. Thus while it denied any negligence on its part it was claiming that if there was any negligence causing the injuries to infant plaintiff it was that of Hakim (and in a separate cross-claim, Associated Anesthesiologists). At the commencement of the trial Hospital voluntarily dismissed its cross-claim against Hakim. This at least was an implicit recognition that it could prove no case of negligence against Hakim. As found herein there was no case of negligence against Hakim.[4]

---

4. At one stage of this litigation Hospital was asserting that Hakim had abandoned infant plaintiff. There is no evidence to support that charge. Indeed the evidence is to the contrary. Hakim stayed at the hospital February 21, 1968, until at least 5:00 P.M. and possibly until 7:00 P.M.

During the period after the infant plaintiff was removed from the operating room to the recovery room, Hakim wrote a number of orders, consulted with the chief of the Hospital's department of neurosurgery together with other physicians and surgeons and made arrangements for the in-

2. Hospital also cross-claimed against Associated Anesthesiologists seeking indemnification if Hospital were in any way held liable in this action. As to that cross-claim Hospital in a post-trial brief filed April 6, 1971, states:

The theory of the Hospital's Cross-Claim vs. the group of defendants known as Associated Anesthesiologists was predicated upon its being held responsible to the plaintiffs by reason of its being responsible vis-a-vis the plaintiff by reason of any negligent act attributable to the anesthesia group. Under the Court's rulings excluding evidence that any malfunctioning or misuse of the hypothermia unit was the responsibility of Associated Anesthesiologists, there is now no basis to support this theory since there was no other evidence introduced to support the theory advanced. Counsel does not withdraw the Hospital's Cross-Claim because the validity of these rulings is vigorously contested. It is conceded, however, that if the Court adheres to these rulings, there is no basis in the record on which the Court could find for the Hospital on its Cross-Claim against the anesthesia group.

From that concession it is clear that Hospital has recognized as the Court has found, that there was no proof of negligence on the part of the Associated Anesthesiologists or their employee, Dr. Ho, at the time of infant plaintiff's cardiac arrest in the operating room. Hospital complains of certain rulings made by the Court during the trial excluding any evidence that "any malfunctioning or misuse of the hypothermia unit was the responsibility of Associated Anesthesiologists."

The hypothermia unit Hospital refers to is the defective equipment the nurses in the intensive care unit were using on infant plaintiff. This is the same equipment which Hospital in one of its very first pleadings in this case admitted was owned by it. And it denied that the machine was malfunctioning or was improperly used by its employees. This pleading was filed January 23, 1970. In answering plaintiffs' interrogatories Hospital again acknowledged ownership of the hypothermia machine. At the same time it asserted that Associated Anesthesiologists had jurisdiction, supervision and control over equipment located in the "Operating Room Suite and Recovery Room." It did not make such assertion with respect to apparatus in the intensive care unit. At no time during the long period of pre-trial discovery did it contend otherwise.

■ At the first pre-trial conference on May 20, 1970, it stated "an hypothermia machine was furnished for infant P's care by the Washington Hospital Center, but denies that said apparatus was defective or that it was operated defectively by its agents, servants or employees." At the two subsequent pre-trial conferences held on June 8, and December 10, 1970, it never altered that position. It was only after the trial was underway, after commencing on January 7, 1971, that it wanted to alter its posi-

---

fant plaintiff to be transferred later that evening to the intensive care unit. When he did leave the hospital to go to another hospital to call on another patient, he did so with the knowledge that the Hospital personnel had his home and office telephone numbers with the instruction to call him should any question concerning the infant plaintiff arise. He had every reason to believe that if the condition of infant plaintiff at any time during the night required his attention, he would be called. Such is not abandonment by Hakim of infant plaintiff. Rodgers v.

Lawson, 83 U.S.App.D.C. 281, 170 F.2d 157 (1948), Quick v. Thurston, 110 U.S. App.D.C. 169, 290 F.2d 360 (1951). It was the Hospital which abandoned Hakim when he was not notified during the night of February 21–22 that the infant plaintiff was suffering three grand mal seizures, a respiratory failure and an apparent second cardiac arrest. The failure of the nurses in the intensive care unit to advise Hakim was contrary to accepted hospital and medical practice. Garfield Memorial Hospital v. Marshall, 92 U.S.App.D.C. 234, 204 F.2d 721 (1953).

tion and introduce evidence that the defective equipment was owned by Anesthesiologists who had the duty to maintain it in operable condition. By that late date many decisions had been made based on the pleadings, discovery and pre-trial conferences. Among such decisions was that of plaintiffs to settle with Associated Anesthesiologists. While the amount of the settlement was substantial it remains open to question whether plaintiffs would have been satisfied with the amount paid if they had known of Hospital's later developed position concerning the defective equipment. The settlement on behalf of the infant plaintiff had to be and was approved by the Court. Whether the Court would have felt the settlement adequate if it had reason to think that the defective equipment was that of Associated Anesthesiologists must remain an unanswered question.

The "Court adheres to these rulings" of exclusion and recognizes the validity of Hospital's post-trial brief assertion that "there is no basis in the record on which the Court could find for the Hospital on its Cross-Claim against the anesthesia group."

The cross-claim is dismissed.

*Hakim's Cross-Claim Against Hospital*
*Associated Anesthesiologists' Cross-Claim Against Hospital*

Hakim cross-claimed against Hospital demanding indemnity (exoneration) or contribution for any sums awarded to plaintiffs against Hakim together with interest and costs. Denying that any defendant was negligent, Hakim alleged that if any negligence was found it resulted from, among other things, the negligent acts of Hospital's employees and its malfunctioning or inoperative equipment.

Before trial Hakim settled with plaintiff and it is the amount of that settlement he seeks to recover from Hospital.

Associated Anesthesiologists by its cross-claim asserted a right to recover by way of indemnity (exoneration) or contribution any sums awarded to plaintiffs against them together with interest and costs. They denied any negligence on the part of any defendants but asserted that if there was any negligence found it resulted, among other things, from Hospital employees' mismanagement of the patient or improper maintenance of the equipment.

As in the case of Hakim, Associated Anesthesiologists settled with plaintiffs before trial and they seek to recover from Hospital the amount they paid in settlement.

Since George's Radio v. Capital Transit Co., 75 U.S.App.D.C. 187, 126 F.2d 219 (1942), there has been in effect in the District of Columbia the rule "that when the parties are not intentional and willful wrongdoers, but are made so by legal inference or intendment, contribution may be enforced." 75 U.S. App.D.C. at 191, 126 F.2d at 223. There the defendant parties were made wrongdoers under the doctrine of *respondeat superior* as they were respectively the employers of the negligent operators of motor vehicles. In Knell v. Feltman, 85 U.S.App.D.C. 22, 174 F.2d 662 (1949) the rule was extended to cover unintentionally negligent tort-feasors even though they personally, and not vicariously, committed the tortious acts.[5]

Indemnification is also a form of relief available in the District of Columbia. Washington Gas Co. v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712 (1896), Moses-Ecco Company v. Roscoe-Ajax Corporation, 115 U.S.App.D.C. 366, 320 F.2d 685 (1963), Coates v. Potomac Electric Power Co., 96 F.Supp. 1019 (D.D.C.1951), Aetna Casualty and Surety Company v. Porter, 181 F.Supp. 81 (D.D.C.1960).

---

5. Unlike some jurisdictions which have adopted the Uniform Contribution Among Tort-feasors Act, the District of Columbia has by judicial decisions adopted the contribution doctrine. Pulvari v. Greyhound Corporation, 287 F.Supp. 104, 106 (D.D.C.1968).

The distinction between contribution and indemnity was with great clarity explained by the late Judge Holtzoff of this Court in Nordstrom v. District of Columbia, 213 F.Supp. 315 (D.D.C.1963), rev'd on other grounds sub nom. District of Columbia v. Nordstrom, 117 U.S. App.D.C. 165, 327 F.2d 863 (1963). At page 318, 213 F.Supp., Judge Holtzoff stated:

> In passing on the cross-claim it is necessary to distinguish between contribution and indemnity. The former apportions damages as between joint tort-feasors on an equal basis in proportion to their number. If contribution is permitted, any one of them who pays more than his share of the damages, is entitled to be reimbursed proportionately by his fellow tort-feasors. On the other hand, indemnity is a right to complete reimbursement on the part of one tort-feasor as against another for the entire amount that the former has been compelled to pay. It is based on a contractual obligation implied in law or a quasi-contract. The rigid doctrine of the common law which barred contribution as between joint tort-feasors, has been abandoned or at least modified in a number of progressive jurisdictions. Thus in the District of Columbia Circuit, the old rule was discarded and a doctrine providing for contribution between joint tort-feasors was adopted by judicial decisions, George's Radio v. Capital Transit Co., 75 U.S.App.D.C. 187, 126 F.2d 219.

> In discussing the subject of indemnity, it seems desirable to classify joint tort-feasors into several categories. First, in some instances joint tort-feasors commit one act of negligence in concert. Naturally, no right of indemnity exists as among them. The second class comprises situations in which the joint tort-feasors are guilty of separate tortious acts, either simultaneously or in chronological sequence, the several acts in combination constituting proximate causes and leading to the plaintiff's injuries. This class may, in turn, be subdivided

into two groups: cases in which the negligence of each tort-feasor equally contributes to the final result, where also there is no basis or reason for indemnity; and, second, cases in which the negligence of one tort-feasor is primary or active, and that of the other is secondary or passive. It has been held that under such circumstances the latter is entitled to indemnity from the former.

> \*    \*    \*    \*    \*    \*

> Still a third category comprehends situations in which one person vicariously answers for the negligence of another. Common instances of this type are cases of a master responding for the negligence of his servant on the principle of *respondeat superior*, and of a principal responsible for the negligence of his agent. In such cases indemnity is allowed in favor of the former against the latter. \*    \*    \*

And the Court of Appeals, in Martello v. Hawley, 112 U.S.App.D.C. 129, 300 F.2d 721 (1962), defined contribution as "a right existing among joint tort-feasors based upon the theory that, as each tort-feasor was at fault in bringing about the injury to the innocent party, then in justice each tort-feasor should share his part in the burden of making the injured party whole again." (112 U.S.App.D.C. at 131, 300 F.2d at 723) To the same effect see McKenna v. Austin, 77 U.S.App.D.C. 228, 134 F.2d 659 (1943), Henry Fuel Company v. Whitebread, 99 U.S.App.D.C. 9, 236 F.2d 742 (1956), Otis v. Thomas, 104 U.S.App. D.C. 343, 262 F.2d 232 (1958), Brightheart v. McKay, 136 U.S.App.D.C. 400, 420 F.2d 242 (1969).

■ While contribution is awarded where the tort-feasors are considered to be equally responsible for the wrong suffered, such is not the case for the award of indemnification. The Court of Appeals in George's Radio v. Capital Transit Company, *supra*, has defined the right to indemnity as follows (75 U.S. App.D.C. at 190, 126 F.2d at 222):

> \*    \*    \*  the latter [indemnity] implies a primary or basic liability in one per-

son, though a second is also liable with the first to a third. In such a case the discharge of the obligation by the second person leaves him with a right to secure compensation from the one who, as between themselves, is primarily liable. As between such persons, the obligation 'is not consensual', but is based altogether upon the law's notion—influenced by an equitable background—of what is fair and proper between the parties.

And to the same effect see Washington Gas Co. v. Dist. of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712 (1896), Coates v. Potomac Electric Power Co., 96 F.Supp. 1019 (D.D.C.1951), Aetna Casualty and Surety Company v. Porter, 181 F.Supp. 81 (D.D.C.1960), Nordstrom v. District of Columbia, 213 F.Supp. 315 (D.D.C.1963), rev'd on other grounds sub nom. District of Columbia v. Nordstrom, 117 U.S.App.D.C. 165, 327 F.2d 863 (1963).

The conclusion to be drawn from the cited cases of this jurisdiction is that neither indemnity nor contribution can be awarded to a party who is not a joint tort-feasor. Such has been the explicit ruling in other jurisdictions. Hennigan v. Atlantic Refining Co., 282 F.Supp. 667 (E.D.Pa.1967); The Toledo, 122 F.2d 255 (2d Cir.), cert. denied 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551 (1941); Press & Shear Machinery Corp. v. L & J Press Co., 326 F.Supp. 483 (E.D. Pa.1971), citing Tugboat Indian Co. v. A/S Ivarans Rederi, 334 Pa. 15, 21, 5 A.2d 153 (1939); Tankredereit Gefion A/S v. Hyman-Michaels Co., 406 F.2d 1039 (6th Cir. 1969) [5a]

Hakim in his post-trial brief asserts that he remained primarily liable for the medical care and attention rendered to the infant plaintiff until he was relieved of that responsibility through the transfer of the case to other physicians. According to him he "cannot escape ultimate responsibility to his patient by relying upon the actions and activities of the hospital and its staff." He claims that the negligence of the hospital acting through its staff leaves him vicariously liable to infant plaintiff and he is therefore entitled to indemnity. For that proposition Hakim cites Price v. Neyland, 115 U.S.App.D.C. 355, 320 F.2d 674 (1963). But that case did not hold the physician, Dr. Price, to be vicariously liable. It is true that there the physician was misled in his diagnosis by mistaken laboratory tests. However, Price was found to have been directly liable because of his failure to comply with good medical practice by not ordering additional tests when the clinical findings were inconsistent with the original laboratory tests.

It is Hohenthal v. Smith, 72 App.D.C. 343, 114 F.2d 494 (1940) which is applicable here. There the Court of Appeals stated (72 App.D.C. 345, 114 F.2d at 496):

> * * * But where employees of the hospital are negligent in carrying out the surgeon's instructions as to treatment after the operation, the overwhelming weight of authority holds that the surgeon is not liable in the absence of a showing that he was negligent in giving the instructions or selecting the persons to carry them out, that he was present and could have avoided the injury by exercising due care, or that his special contract relative to the negligent employee was such as to make the doctrine of respondeat superior applicable. * * *

As has been shown here it was Hospital's employees who were negligent in carrying out Hakim's instructions as to treatment after the operation. The evidence in this case shows that Hakim's

---

5a. Moses-Ecco Company v. Roscoe-Ajax Corporation, 115 U.S.App.D.C. 366, 320 F.2d 685 (1963), is distinguishable from the instant case on two grounds. First, there was there a contract for indemnification, with only a showing of the reasonableness of the settlement being required of the contract indemnitee. Second, there was no adjudication of liability in that case, while here those who seek indemnification have been found to be free of tortious conduct.

instructions for post-cardiac arrest care conformed with recognized medical standards. It was the Hospital which selected the nurses and other personnel in the intensive care unit. Hakim had no special contract relationship with them to make the doctrine of *respondeat superior* applicable to him. Part of the services furnished to the infant plaintiff and charged for by the Hospital was the assistance of the intensive care unit nurses, residents and attendants in caring for the infant plaintiff in that unit. They were to carry out the instructions of Hakim, but that they failed to do. They were employees of the Hospital. Hakim was not present when the negligence of the Hospital was causing the permanent harm to the infant plaintiff because he was never notified as he should have been of the change in infant plaintiff's condition.

In holding as the Court of Appeals did in *Hohenthal,* it was following a line of federal and state cases as shown in note 2 of that opinion. As recently as 1968 the United States Court of Appeals for the Fourth Circuit cited and followed *Hohenthal* in holding a physician free of liability in circumstances similar to those here. Moore v. Guthrie Hospital, Inc., 403 F.2d 366, 368 (1968).

■■■ Hakim was not vicariously liable. He was neither passively nor secondarily negligent. In the circumstances here he is as free of liability as was Dr. Smith in the *Hohenthal* case and Dr. Moore in the *Guthrie Hospital* case. In fact he has been found not to have been negligent in any way. He was not a tort-feasor and, therefore, is not entitled to either indemnity or contribution.

Associated Anesthesiologists do not assert that they are vicariously liable. In fact in their post-trial memorandum they argue that the evidence in this case conclusively establishes "that the injuries which came to the infant plaintiff were caused *solely* by the negligence of the Hospital employees and the defective hospital equipment." From this they argue that they are entitled "to full indemnity" from the Hospital for the payments they made in settlement with the plaintiffs.

This Court has found, as Associated Anesthesiologists contend, that the Hospital is solely responsible for infant plaintiff's injuries. But Associated Anesthesiologists' claim for indemnity fails as does its alternative claim for contribution. They were not tort-feasors and, therefore, they hold no right to either indemnity or contribution.[6]

This conclusion is not altered by the fact that Hakim and Associated Anesthesiologists entered into separate settlement agreements with plaintiffs under the terms of which the latter received substantial sums. By their respective agreements Hakim and Associated Anesthesiologists "specifically deny all liability" to the plaintiffs "and make payment hereunder solely by way of compromise of a disputed claim." Those denials of liability were consistent with the positions those defendants had asserted from the beginning, first in their pleadings and then at the pre-trial conferences as reflected in the pre-trial orders. Subsequent to the October 9, 1970, approval by the Court of the settlement agreements, the cross-claims were tried.[7] Throughout the trial Hakim and Associated Anesthesiologists continued to assert that they were in no way responsible for the injuries suffered by the infant plaintiff. As noted hereinbefore, Associated Anesthesiologists in their post-trial memoranda contend that those in-

---

6. There is not in this case an express contract of indemnification between any of the parties to the action. Thus there is not involved here questions of contract rights and obligation as there was in St. Louis Dressed Beef & Provision Co. v. Maryland Casualty Co., 201 U.S. 173, 26 S.Ct. 400, 50 L.Ed. 712 (1906). See also Moses-Ecco Company v. Roscoe-Ajax Corporation, 115 U.S.App.D.C. 366, 320 F.2d 685 (1963).

7. Because of the minority of the infant plaintiff the settlements had to be approved by the Court to be valid. Sec. 21–120 D.C.Code (1967).

juries resulted "solely" from the negligence of the Hospital. Hakim, like Associated Anesthesiologists, has asserted in his post-trial memoranda and proposed findings of fact and conclusions of law that Hospital's negligence was the sole proximate cause of infant plaintiff's injuries. Hakim's position varies from that of Associated Anesthesiologists only in that he considers himself to be vicariously or secondarily liable because he was the treating physician-surgeon; a contention hereinbefore considered and rejected.

In the context of this case the settling defendants are, in the legal sense, volunteers. Hudson v. Lazarus, 95 U.S. App.D.C. 16, 217 F.2d 344 (1954). But that is not to say that the payments made by them were made imprudently. At the time the settlement agreements were entered into the settling defendants were faced with plaintiffs' serious claims for large sums. Settling defendants and their able, experienced counsel had learned through extensive discovery of the serious permanent injuries which the infant plaintiff had sustained. They were all aware that at trial the jury would have before it a pitiful child who was permanently blind and whose limbs were permanently useless. There was no way the settling defendants had of knowing how the facts would be found but they had every reason to believe that, whatever the verdict might be, it would be for the plaintiffs and in a large sum. To avoid the risks entailed they entered into the settlements. But having been found by the Court not to be tort-feasors, settling defendants are volunteers and are entitled to no relief.

A contrary ruling would result in imposing on the wrongdoer a liability in excess of what has become fixed in the law of torts. "In general the law seeks to award compensation, and no more, for personal injuries negligently inflicted." Hudson v. Lazarus, 95 U.S. App.D.C. 16, 18, 217 F.2d 344, 346 (1954). Here the jury has awarded plaintiffs full compensation in the total amount of $294,777.25 for the injuries inflicted on infant plaintiff by Hospital. That is all the compensation to which plaintiffs are entitled. Hospital should not be required to reimburse Hakim and Associated Anesthesiologists for their voluntary payments. As will be more particularly treated hereafter, Hospital cannot credit on the judgment awarded against it those payments. If a wrongdoer were to be compelled to reimburse such payments, the law might be used in some cases, but certainly not here, to promote collusion between an injured party and one who would be inclined to make a voluntary payment to the injured one. Such a result would be abhorrent to the equitable principles from which the right to indemnity has emerged.

*Hospital's Claim for Credit on the Verdict*

After the return of the jury's verdict in the amount of $294,777.25 in favor of plaintiffs and against Hospital, the latter filed a motion to credit the amount of $270,000.00 paid by the settling defendants to plaintiffs. The memoranda of Hospital in support of the motion and the memoranda of plaintiffs in opposition thereto cite a number of cases.[8] Those cases are not apposite here. They all deal with joint tort-feasors, the right to contribution and the means of asserting and establishing such right. But in this case there are no joint tort-feasors. Hospital has been found to be solely responsible for infant plaintiff's injuries. Hakim and Associated Anesthesiologists not being tort-feasors cannot recover in whole or in part from Hospital for the sums they have paid in settlement. McKenna v. Austin, 77 U.S.App.D.C. 228,

---

8. See for example: Cudd v. Great American Insurance Company, 202 F.Supp. 237 (W.D.La.1962), McWhirter v. Otis Elevator Co., 40 F.Supp. 11 (W.D.So.Car. 1941), Mayle v. Criss, 169 F.Supp. 58 (W.D.Pa.1958), Sweep v. Lear Jet Corporation, 412 F.2d 457 (5th Cir. 1969), Arkansas Power & Light Co. v. Liebe, 144 S.W.2d 29 (Ark.1940), Kansas City Southern Ry. Co. v. McDaniel, 131 F.2d 89 (8th Cir. 1942), Daily v. Somberg, 28 N.J. 372, 146 A.2d 676 (1958).

134 F.2d 659 (1943). They were not settling tort-feasors who bought their peace and it is not unfair to Hospital that it cannot be credited with all or a portion of the settlement payments. Martello v. Hawley, 112 U.S.App.D.C. 129, 300 F.2d 721 (1962).

Hospital argues that not to credit it with the payment made by the settling defendants results in plaintiffs profiting from their harm. It contends that plaintiffs may receive only full compensation for the injuries suffered. It cites McKenna v. Austin, *supra.*

But there the Court of Appeals stated that an injured party has no right to profit from his harm "because several share in causing it." 77 U.S.App.D.C. at 233, 134 F.2d at 664. But here no one shared with Hospital in causing the harm; it alone was the proximate cause.

Moreover, it has been held here that the payments made by Hakim and the Associated Anesthesiologists to plaintiffs were, in the legal sense, voluntary. They were, in legal terminology, "collateral sources." Hospital cannot complain that those sources paid plaintiffs sums in addition to the compensatory damages awarded by the jury against Hospital. In Hudson v. Lazarus, *supra,* the Court of Appeals stated (95 U.S.App.D.C. at 18–19, 217 F.2d at 346–347):

> In general the law seeks to award compensation, and no more, for personal injuries negligently inflicted. Yet an injured person may usually recover in full from a wrongdoer regardless of anything he may get from a 'collateral source' unconnected with the wrongdoer. Usually the collateral contribution necessarily benefits either the injured person or the wrongdoer. Whether it is a gift or the product of a contract of employment or of insurance, the purposes of the parties to it are obviously better served and the interests of society are likely to be better served if the injured person is benefitted than if the wrongdoer is benefitted. Legal 'compensation' for personal injuries does not actually compensate. Not many people would sell an arm for the average or even the maximum amount that juries award for loss of an arm. Moreover the injured person seldom gets the the compensation he 'recovers', for a substantial attorney's fee usually comes out of it. There is a limit to what a negligent wrongdoer can fairly, i. e., consistently with the balance of individual and social interests, be required to pay. But it is not necessarily reduced by the injured person's getting money or care from a collateral source.

> However it be rationalized, the 'collateral source' principle has been applied in various situations. Receipt of money on an accident insurance policy does not reduce the damages the injured person may recover. The same has been held with regard to hospitalization insurance. And when medical and hospital services have been rendered gratuitously, or paid for by a third person as a gift to the injured person, he has usually been allowed to recover their value from the wrongdoer.

And there is no merit to Hospital's contention that it has a right to credit on the verdict because the Court instructed the jury that, if they found that the conduct of the Hospital was a substantial factor, a concurring proximate cause, in producing the injuries sustained by infant plaintiff, they should compensate plaintiffs fully for all injuries and damages suffered by them even though they might find that the negligence of some other person or persons contributed to cause the injuries. Hospital was the only defendant before the jury. Obviously they found Hospital to be a wrongdoer. Neither plaintiffs nor Hospital requested a special verdict or a general verdict accompanied by answers to interrogatories. However, this Court in trying the cross-claims has found the Hospital employees to be concurring causes. And the Court tried the

cross-claims because all of the parties, including Hospital, at the December 10, 1970, pre-trial conference stipulated that they would be tried "by the Court and not by the jury."

There is no basis for crediting the $270,000.00 paid in settlement to the $294,777.25 jury verdict against the Hospital.

Hospital also claims a credit of $7,-964.70 on the verdict. It asserts that this is the unpaid balance of the hospital bill incurred by plaintiffs for the care of infant plaintiff. Hospital counterclaimed for this amount but it did not prosecute that claim. Nor did it object when the father plaintiff testified that that amount together with other sums were expenses incurred by him for the care of infant plaintiff.

At the December 10, 1970, pre-trial conference plaintiffs and Hospital stipulated that, if Hospital was found not to be liable to the plaintiffs, the unpaid balance of the bill would be paid. Plaintiffs now argue that it was implicit in such stipulation that if the jury found in favor of plaintiffs, the unpaid balance would not be paid.

At the October 9, 1970, settlement conference in chambers, plaintiffs challenged the validity of the Hospital's claim for the unpaid balance.[9] From the position taken in their post-trial memoranda in opposition to Hospital's motion for credit on verdict, it appears that plaintiffs continue to question the validity of the claim.

Because the counterclaim was not prosecuted and in light of plaintiffs' position, the claimed unpaid hospital bill will not be credited on the verdict. Whether Hospital can in any other action reassert the claim is not a question before the Court.

*Miscellaneous Matters*

1. Following the jury verdict plaintiffs filed pursuant to Rule 54(b) Fed. R.Civ.P. a motion to enter final judgment. Hospital opposed the motion. Because of the matters before the Court, including Hospital's motion for credit on the verdict, action on the motion was deferred. In view of the Court's ruling at this time and the order being entered contemporaneously with the filing of this opinion, plaintiffs' motion will be denied as moot.

2. During the briefing period following the trial, Hospital filed a request for admissions. That request was opposed by plaintiffs and the other defendants. The requests were with respect to the insurance coverage of settling .defendants, plaintiffs' settlement proposals and the allocation of the settlement payments. These requests were filed not only after pre-trial discovery had been closed but after all the evidence was in and the Court had the case under advisement. Moreover, they were unrelated to the issues tried by the Court. The objections to the requests are sustained.

3. Shortly after the jury verdict was entered and while the cross-claims litigation was under advisement, plaintiffs filed a motion to retax costs. Hospital objected to the motion and among other things contended that the matter of taxing costs was not timely since no final judgment had been entered. Plaintiffs' motion to retax costs is denied without prejudice to filing another motion upon the entry of final judgment, provided that plaintiffs support with pertinent authorities their claim to the costs they seek.

An order reflecting the action taken by the Court is being entered.

9. The settlement conference was recorded. A transcript of the record has been sealed and is on file with the Clerk of the Court. It is to be unsealed only on order of the Court for good cause.