Harold POLISCHECK, Administrator of
the Estate of Geraldine
Polischeck, Deceased

v.

UNITED STATES of America.

Civ. A. No. 80–1229.

United States District Court,
E. D. Pennsylvania.

April 1, 1982.

Joseph F. Busacca, Philadelphia, Pa., for plaintiff.

Peter F. Vaira, Jr., U. S. Atty., James G. Sheehan, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM

BECHTLE, District Judge.

On October 5, 1981, the above-captioned matter came before the Court for trial

without a jury. Upon the completion of the trial, the Court permitted the parties to submit proposed findings of fact and conclusions of law. Having now considered the evidence and the submissions of the parties, the Court enters the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.[1]

## FINDINGS OF FACT

1. This action was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 et seq. Plaintiff is at the present time, and plaintiff's decedent and plaintiff also were at all times material hereto, citizens of the Commonwealth of Pennsylvania residing at the address above captioned.

2. Plaintiff, Harold Polischeck, is the surviving spouse of Geraldine R. Polischeck, deceased ("decedent"), who died on October 30, 1978. See Exhibit P1. Plaintiff was appointed Administrator of the decedent's estate by the Register of Wills of Montgomery County, Commonwealth of Pennsylvania on September 27, 1979. See Exhibit P2.

3. During October, 1978 and for sometime prior thereto, defendant, the United States, controlled, staffed and operated a medium size hospital and emergency room facility known as the Naval Regional Medical Center ("NRMC"), located at the Philadelphia Naval Base, Philadelphia, Pa. At the NRMC, defendant undertook to provide medical care, hospital care and emergency room services to, among others, its retired military personnel and their dependents.

4. The Naval Regional Medical Center was not at any time material hereto a "teaching hospital," as that term is generally understood in the medical profession, nor is it directly affiliated with any medical school or university. Stipulation of Facts, Docket Entry No. 38, ¶ 9.

5. Each day, during the sixteen hour time period from 4:00 o'clock p. m. to 7:00 o'clock a. m., the defendant's emergency room was staffed by corpsmen, nurses, physician's assistants and one of defendant's naval hospital staff doctors.

6. At all times material hereto, the defendant did not have a neurosurgeon or neurologist on the hospital staff at the NRMC. Patients requiring such neurological care and attention would first be seen by the staff internist and would be referred to a civilian hospital if further medical attention or care were required.

7. A physician's assistant is a paramedically trained member of armed forces personnel. To become a physician's assistant, a person receives one year of classroom instruction at physician's assistant school, studying a variety of basic medical topics, followed by one year of clinical rotation in a hospital or hospitals alongside full-time medical students. Testimony of Steve Garman.

8. At all times material hereto, the defendant, as a general practice, had its physician's assistants examine and treat approximately 50 to 65% of its emergency room patients. Testimony of Steve Garman. Approximately 50 to 100 patients would be seen daily at the defendant's emergency room.

9. The defendant permitted its physician's assistants to perform all of the following without the intervention or participation of any physician then on duty in the emergency room:

(a) Take and record medical histories from patients;

(b) Investigate and record the patients' complaints;

(c) Perform physical examinations and order diagnostic tests such as blood counts and urinalysis;

(d) Render diagnoses;

(e) Prescribe routine medication;

(f) Counsel and advise patients regarding follow-up medical care;

---

1. Neither of the parties requested a transcript of all or any part of the proceedings. Accordingly, in making findings of fact based only on the testimony not transcribed, the Court has relied upon its notes and independent recollection of the testimony.

(g) Send patients home if the physician's assistant felt that the patient's complaints and/or illnesses were not serious. Testimony of Steve Garman.

10. Physician's assistants were authorized to exercise their own judgment when treating patients in the emergency room as to whether or not they would require the assistance or intervention of the emergency room physician. *Id.*

11. At all times material to this action, defendant did not have in effect any regulation, procedure or policy requiring that each emergency room patient be seen by a medical doctor before the patient's discharge. Testimony of Dr. SanFelipe; Testimony of Steve Garman.

12. At all times material to this action, defendant did not have in effect any regulation, procedure or policy requiring that the medical chart or emergency room treatment record of each emergency room patient be reviewed by a medical doctor before or after the patient's discharge. Testimony of Dr. SanFelipe; Testimony of Steve Garman.

13. With the exception of a prior hysterectomy, the plaintiff's decedent had always been in good health.

14. Plaintiff's decedent became ill while she and her husband were enroute to a furniture convention in North Carolina. Plaintiff's decedent first complained of a headache in Virginia on either Monday or Tuesday, October 23 or October 24, 1978, prior to her visiting the defendant's emergency room. The plaintiff's decedent also developed an elevated temperature, began to experience nausea, was vomiting and complained that the top of her head was blowing off and of pressure behind her eyes.

15. On Wednesday, October 25, 1978, plaintiff and plaintiff's decedent discontinued their trip and drove to the NRMC, where they arrived at approximately 6:45 p. m. Testimony of Harold Polischeck; Exhibit P3.

16. When they arrived, the initial information and plaintiff's decedent's complaints were taken down by a corpsman or nurse. Exhibit P3, blocks 3–16. In doing so, the corpsman or nurse who completed block 16 of Exhibit P3, entitled "chief complaint and present illness," was not required to record remarks made by plaintiff's decedent verbatim but was allowed to abbreviate the symptoms recited. The corpsman or nurse also took the vital signs of plaintiff's decedent and marked them down on the chart. Exhibit P3, block 17.

17. Plaintiffs were next seen by physician's assistant Garman, who was dressed in whites, wore a name tag which stated, "Steve Garman, P.A.," and saw plaintiffs in an office or examination room with the same name and initials posted on the door. Garman told them that he was "Steve Garman" and did not identify himself as a physician's assistant.

18. At trial, Garman had no independent recollection of treating plaintiff's decedent and had to refer to the chart to determine what he did and what he found. According to those records, which he acknowledged to be accurate and in part in his handwriting, Garman questioned plaintiffs regarding Geraldine's illness and complaints and completed that portion of the chart entitled "expansion of history."

19. Garman noted the following symptoms and history in the portion of the chart aforesaid: "sudden onset of vertex headache four days ago with malaise, nausea, and occular myalgias." Exhibit P3.

20. At the time of her emergency room visit on October 25, 1978, decedent's temperature was 100.4 degrees and her blood pressure was 144/90 mm Hg, which is high/normal. Exhibit P3; Testimony of Dr. Kassell. Garman performed an abbreviated neurologic examination which revealed photophobia but no nuchal rigidity. Blood tests ordered by Garman disclosed a slightly elevated white blood count. Exhibit P3; Testimony of Dr. Kassell.

21. Garman believed there was nothing seriously wrong with plaintiff's decedent and made a diagnosis of flu syndrome because the flu was going around. He then

prescribed fiorinal and tylenol, routine medications for the flu, and instructed plaintiff's decedent to return to the emergency room if her symptoms became worse or her temperature became more elevated.

22. During this visit to the NRMC, plaintiff's decedent was not examined in any respect by a licensed physician, nor was plaintiff's decedent's chart reviewed in any respect by a licensed physician.

23. Plaintiffs returned home to Pottstown. Geraldine Polischeck continued to suffer from headaches, elevated temperature, pressure in her head, nausea and vomiting, and for the most part remained in bed.

24. On October 27, 1978, at approximately 6:45 p. m., plaintiffs again visited defendant's emergency room. Harold Polischeck transported his wife from their car to the emergency room by wheelchair because she was unable to walk. The same admission procedure was followed as on their first visit to the emergency room, and almost identical symptoms were noted on the chart. Exhibit P4, block 16.

25. The plaintiffs were again seen by physician's assistant Garman, but this time he referred them to the emergency room physician on duty, Dr. SanFelipe.

26. Dr. SanFelipe was and is a medical doctor who attended medical school and received her medical training in the Philippines and who was trained in pediatrics primarily. Dr. SanFelipe is not now and has never been licensed in any state. Testimony of Dr. SanFelipe.

27. Dr. SanFelipe was taught neurology while she was attending medical school and did treat patients with neurological problems while she was an intern and a resident. Further, the doctor admitted she was trained to perform and, in fact, had done lumbar punctures on prior occasions. *Id.*

28. At trial, Dr. SanFelipe had no independent recollection of decedent and had to refer to the chart to determine what she had been told and what she did.

29. Dr. SanFelipe interrogated plaintiffs regarding Geraldine's illness and noted her findings in the expansion of history portion of the chart. Exhibit P4. Dr. SanFelipe felt that decedent's vital signs were improved as compared to those demonstrated when she first came to the emergency room. Dr. SanFelipe performed a physical examination and marked her findings on the chart. Exhibit P4, block 17.

30. The hospital chart states that the plaintiff's decedent was alert but "looked sick and felt as if her head would explode."

31. Dr. SanFelipe also noted in the physical findings section of the chart that decedent was ambulatory but admitted at trial that she had not seen plaintiff walk except with her husband's assistance once the physical examination was concluded.

32. A fundoscopic examination was performed which she felt was within normal limits; there was no nuchal rigidity; a negative kernig sign and plaintiff's extremities were tested and found to be within normal limits. Dr. SanFelipe had to examine decedent with an opthalmoscope twice because decedent was winking and blinking at the light. Testimony of Harold Polischeck. The doctor admits this indicated photophobia and that she didn't mark this symptom on the chart. Testimony of Dr. SanFelipe.

33. Dr. SanFelipe did not know what was wrong with plaintiff's decedent and accordingly made a diagnosis of "headaches, etiology unknown." Testimony of Dr. SanFelipe; Exhibit P4, block 17.

34. Dr. SanFelipe prescribed medication for headaches and recommended that plaintiff be seen in the internal medicine clinic on Monday if the headache persisted or sooner if the headache became worse. Exhibit P4.

35. Plaintiff and his decedent were once again sent home, and plaintiff's decedent went to bed upon arrival.

36. Later on that evening, Mr. Polischeck heard plaintiff's decedent snoring loudly, tried to rouse her and found he could not. He roused a neighbor and the two of them drove Geraldine Polischeck back to the emergency room at the NRMC.

37. The three of them arrived at the emergency room at approximately 2:15 a. m. on the morning of October 28, 1978. Once again plaintiff's decedent was examined by Dr. SanFelipe. After this examination, Dr. SanFelipe decided that plaintiff's decedent was suffering from an intracerebral hemorrhage and made arrangements for plaintiff's decedent to be transferred to the Hospital of the University of Pennsylvania. Exhibit P5.

38. Plaintiff's decedent was transported by defendant's ambulance to the hospital aforesaid where immediate measures were taken to diagnose and treat her condition. The hospital's physicians felt that plaintiff's decedent had either suffered an intracerebral hemorrhage or a subarachnoid hemorrhage with possible tumor. Plaintiff's decedent was intubated, hyperventilated and given mannitol and decadron to reduce swelling and intracranial pressure. An arteriogram was performed which showed a large subdural hematoma and a right posterior communicating artery aneurysm, demonstrating that plaintiff's decedent had suffered a subarachnoid hemorrhage. Dr. Leonard Bruno performed a right frontopariatal craniotomy with evacuation of a subdural hematoma and clipping of the right posterior communicating aneurysm. Testimony of Dr. Leonard Bruno; Exhibit P6.

39. Plaintiff's decedent did very poorly postoperatively and never regained consciousness. On October 30, 1978, she went into respiratory failure, developed cardiac arrhythemia and expired. An autopsy was not performed.

40. In or about 1978, it was the generally accepted medical practice in Philadelphia hospitals—whether primary, secondary or tertiary care facilities—that patients seen in emergency rooms would not be discharged until either the patient's chart had been reviewed, or the patient himself or herself had been examined, by a licensed physician. Deposition of Dr. Neal Kassell, at 6–10, 17–18.

41. The symptoms of subarachnoid hemorrhage are the sudden onset of a severe headache, nausea and vomiting, perhaps a decreased level or loss of consciousness, and perhaps weakness, followed in time by elevated temperature, malaise, photophobia, and nuchal rigidity (stiffness of the neck). Deposition of Dr. Neal Kassell, at 26. These symptoms of subarachnoid hemorrhage are commonly taught in medical school to all medical students. *Id.* Thus, as both plaintiff's and defendant's experts agreed, any physician, regardless of specialty, possessing and employing the skill and knowledge usually possessed by physicians in Philadelphia in 1978, would have known and recognized that the presence of the above-named symptoms in a patient would suggest the possibility of a subarachnoid hemorrhage. *Id.*; Testimony of Dr. Hubert Mickel.

42. The absence of nuchal rigidity in a patient who exhibits all other symptoms of a subarachnoid hemorrhage does not foreclose the possibility that such a hemorrhage has occurred. Under those circumstances, a physician possessing and employing the skill and knowledge usually possessed by physicians in the Philadelphia area in 1978 would nevertheless have at least considered the possibility of a subarachnoid hemorrhage and have taken steps to confirm or rule out that possibility. Deposition of Dr. Neal Kassell, at 28–29.

43. A physician possessing and employing the skill and knowledge usually possessed by a physician in Philadelphia in 1978, in treating a patient exhibiting the symptoms recorded on Exhibit P3, would have considered a subarachnoid hemorrhage as a possible diagnosis. Deposition of Dr. Neal Kassell, at 28–29. The Court specifically finds that the absence of nuchal rigidity would not have ruled out the possibility of subarachnoid hemorrhage. *Id.* at 25–26.

44. A physician possessing and employing the skill and knowledge usually possessed by physicians in Philadelphia in 1978, in treating a patient exhibiting at the time of the visit the symptoms and history recorded on Exhibits P3 and P4, would have considered a subarachnoid hemorrhage as a possible diagnosis. Deposition of Dr. Neal Kassell, at 42.

45. A diagnosis of subarachnoid hemorrhage can be confirmed by performing a lumbar puncture, a medical procedure in which a long needle is inserted between two vertebrae into the fluid-filled cavity around the spinal cord and a sample of the fluid is allowed to drip off. After a subarachnoid hemorrhage, the fluid, which is normally colorless, will be bloody or pink or slightly discolored. Laboratory analysis of the specimen can demonstrate whether a result uncertain to the naked eye is positive or negative. Deposition of Dr. Neal Kassell, at 29–30. Where a patient has had a subarachnoid hemorrhage, a lumbar puncture almost always shows a positive result, the only exceptions being cases in which the lumbar puncture is performed within minutes of the subarachnoid hemorrhage. *Id.* at 33. The test also involves very little risk of complicating injury to the patient. *Id.* at 33–34.

46. A lumbar puncture is the principal diagnostic test for subarachnoid hemorrhage, and has been in continuous and routine use since the 1920's. A physician possessing and employing the skill and knowledge usually possessed by a physician in Philadelphia in 1978 would have known of the lumbar puncture procedure and its usefulness in diagnosing a subarachnoid hemorrhage, and would have been able to perform the procedure if necessary. *Id.* at 31–33.

47. If plaintiff's decedent's condition had been properly diagnosed as a subarachnoid hemorrhage at the NRMC at the time of the first visit on October 25, 1978, plaintiff's decedent could have been quickly referred to a hospital with adequate facilities for treating such a condition, such as the Hospital of the University of Pennsylvania. There, a proper subarachnoid hemorrhage routine could have been instituted. *See* Deposition of Dr. Neal Kassell, at 35–37. If plaintiff's decedent had been so referred and treated on October 25, 1978, plaintiff's decedent would have had a 90% chance of surviving and a 75% chance of recovering sufficiently to assume her normal activities of daily life. *Id.* at 50–51.

48. At the time of her death, decedent was 44 years old and, but for the subarachnoid hemorrhage, would have had a statistical life expectancy of 36.1 years. Exhibit 12B. Nevertheless, even if decedent had received proper care, decedent had only a 75% chance of sufficiently recovering from the subarachnoid hemorrhage to resume her previous life and occupations. Accordingly, a reasonable estimate of her life expectancy, adjusted for the possibility that she may not have recovered despite proper care, is 27 years.

49. Plaintiff, Harold Polischeck, is presently 53 years of age and has a statistical life expectancy of 22.4 years. *Id.*

50. In August, 1980, plaintiff, Harold Polischeck suffered a stroke leaving him paralyzed on the left side of his body. He now requires simple nursing services which would have been provided by the decedent had she survived, but which are now furnished by his mother-in-law.

51. At the time of her death, plaintiff's decedent was employed by the Department of the Navy as a GS7 earning $16,052.00 per year. Exhibit P8.

52. At the time of trial, decedent, had she lived, would have been earning $20,170.00 per year. Exhibit P9.

53. Decedent would most probably have retired at age 55, for although she would then have received a smaller pension than she would have if she had retired at age 60, she would have been better able to care for her stricken husband and bear the burdens imposed by the operation of the couple's retail furniture store.

54. Plaintiff, Harold Polischeck, incurred funeral expenses in the sum of $3,526.55.

55. As a result of decedent's death, plaintiff has suffered a past loss of income which decedent would have contributed. At the time of her death, decedent was employed by the Department of the Navy as a GS7, earning $16,052.00 per year. This salary, when combined with plaintiff's own pension of $5,100.00 per year, formed the couple's sole source of income. The couple

expended approximately $300.00 per week on joint maintenance, totalling $15,600.00 per year. This would leave $5,552.00 net income, which was divided equally between the plaintiff and decedent. Since plaintiff's share of the cost of maintenance exceeded the amount he received on a pension, plaintiff's share of the annual net income was contributed entirely by decedent. Thus, over the three years since decedent's death, plaintiff has suffered a past loss of decedent's contributed income equal to $8,328.00. Exhibit 12B.

56. In addition to a loss of past contributed income, plaintiff suffered by decedent's death a future loss of contributed income. If decedent had lived, decedent would now be earning $20,170.00 per year. Exhibit P8. When added to plaintiff's pension of $5,100.00 per year, the couple would have had an income of $25,270.00 per year. After $15,600.00 is subtracted for maintenance, the couple's net income would be $9,670.00, As discussed above, one-half of that amount represents decedent's annual contribution to plaintiff. Thus, over the 7.5 years of worklife which would have remained to decedent had she lived, she would have contributed $36,262.50 to plaintiff.

57. The death of the decedent also deprived plaintiff of decedent's future contribution from her pension upon retirement. If decedent had lived and retired at age 55, she would have been entitled to an annual pension equal to 66% of the average salary she received in her three highest paying years, or $13,312.20 per year. Adding that amount to the amount of plaintiff's pension yields a total annual income for plaintiff and decedent of $18,412.20. When the couple's maintenance expenses are deducted, there remains a net income of $2,812.20 to be divided between plaintiff and decedent. Thus, decedent's contribution to plaintiff over the 14.9 years which would have remained of plaintiff's life (husband's life expectancy of 22.4 years less the remainder of decedent's worklife expectancy of 7.5 years) would amount to $20,950.89. In so finding, the Court notes explicitly that there is no support in the record, either in factual testimony or expert opinion, for reducing the amount of money annually expended by plaintiffs for maintenance. Thus, in absence of any explanation for this shift, we reject the percentage figure used by plaintiff's expert in his calculations for future loss of contributed pension.

58. Plaintiff also lost decedent's past services in the operation of their retail furniture store. Plaintiff and decedent began the business, which was never incorporated, in 1970. Although all of the store's inventory is paid for, the store has never yielded a profit. Nevertheless, decedent worked in the store about 25 hours per week, working evenings and Saturdays. Testimony of Harold Polischeck. Decedent acted primarily as bookkeeper, but she also assisted in buying, decorating and selling. In determining the hourly value of decedent's services, two factors are important. First, although decedent had worked for some uncertain period of time as an assistant buyer at an area department store, evidence of any substantial training or experience as a bookkeeper is absent. In addition, decedent rendered her bookkeeping and other services only at the end of full days and weeks of work in her job with the Department of the Navy. For both reasons, her services must be valued at a considerably lower rate than the services of a full-time bookkeeper. Accordingly, the Court values her services at $3.50 per hour. Thus, the loss of the decedent's services as bookkeeper and assistant over the past three years may reasonably be valued at $13,650.00.

59. Plaintiff further lost decedent's future services as bookkeeper and assistant in the operation of their retail furniture store. It is most likely that decedent, having had a strong interest in the operation of the store, would have begun to work for the store full-time after retiring from her job with the Department of the Navy at age 55, and would have continued to work at the store until age 60. At the same time, it is also reasonable to assume that she would not have continued to work the long evening hours after her retirement from the Department of the Navy. Thus, the Court believes decedent would reasonably have

worked 50 hours per week. Based on these considerations, $34,125.00 is the reasonable value of plaintiff's future loss of services in the retail furniture store until decedent's age 55, and $45,500.00 is the reasonable value of plaintiff's future loss of the same services from decedent's age 55 to decedent's age 60—a total of $79,625.00.

60. Decedent also performed services as housewife for 15 hours per week. Testimony of Harold Polischeck. These chores were performed in addition to the decedent's job with the Department of the Navy and her duties in the furniture store. Accordingly, decedent's services as housewife must be assigned a lower value than those of a full-time, professional housekeeper who would not be obliged to perform those chores after spending long days engaged in other fatiguing occupations. Under all the circumstances, the Court believes the reasonable value of decedent's services to be $3.00 per hour, or $7,020.00 for the past three years, and $52,416.00 for the remaining 22.4 years of plaintiff's life expectancy.

61. Decedent's death also caused plaintiff to suffer the loss of nursing services decedent would have been able to provide after plaintiff suffered his stroke approximately one year prior to trial. Those services, now performed by plaintiff's mother-in-law, require approximately one hour each day every day of the week, and consist of basic tasks such as helping plaintiff dress. Considering the simplicity of the duties involved and the little time they require each day, the Court believes their reasonable value to be $1,000.00 each year, or $1,000.00 for past loss of decedent's nursing services, and $22,400.00 for future loss of those services.

62. By reason of decedent's death, decedent's estate suffered the loss of past wages, over and above the cost of decedent's maintenance, for the three year period between decedent's death and the trial. Combining decedent's $16,052.00 annual salary with plaintiff's $5,100.00 per year pension, and subtracting $15,600.00 for maintenance costs, leaves $5,552.00 of annual net income which would have been divided equally between plaintiff and decedent.

Thus, the total of decedent's shares over the past three years would have been $8,328.00.

63. Decedent's estate also suffered the loss of decedent's future wages, over and above the cost of maintenance. Combining the $20,170.00 annual salary which decedent would now have been receiving with plaintiff's $5,100.00 per year pension, and subtracting $15,600.00 for the annual cost of maintenance, leaves $9,670.00 of annual net income which would have been divided equally between plaintiff and decedent. Thus, over the 7.5 years of decedent's remaining worklife, she would have retained $36,262.50.

64. Decedent's estate has also been deprived of decedent's future pension benefits which would have been received during plaintiff's lifetime. As stated above, decedent, retiring at age 55, would have been entitled to an annual pension of $13,312.20. When this amount is added to plaintiff's annual pension of $5,100.00, and $15,600.00 is deducted for the annual cost of maintenance, there remains annual net income of $2,812.20 to be divided equally between plaintiff and decedent. Thus, over the remaining 14.9 years of plaintiff's life expectancy, decedent would have received $20,950.89.

65. Finally, decedent's estate suffered the loss of decedent's future pension benefits which would have been received over the years of decedent's life remaining after plaintiff's death. At that time, decedent's annual pension, $13,312.20, would reasonably have been subject to only half the cost of the *couple's* annual maintenance, or $7,800.00, leaving $5,512.20 net income per year to decedent. Since, according to the life expectancies of the plaintiff and decedent adopted by the Court, decedent would have outlived plaintiff by only 1.6 years, decedent's estate suffered a loss of pension benefits over that period of $8,819.52.

66. No award will be made to decedent's estate in compensation for pain and suffering. Even if decedent had received proper medical care, she would nevertheless have suffered the pain and other symptoms of subarachnoid hemorrhage from the time of

its occurrence until, at the earliest, some time on the evening of Wednesday, October 25, 1978. The difference between the pain suffered by plaintiff between the time she would have received pain-reducing care and the time she finally became unconscious on Friday, October 27, 1980, is speculative at best on the present record.

## DISCUSSION

■ In the foregoing paragraphs the Court has presented the facts of this case in considerable detail. Since the bulk of the Court's findings need no explanation beyond that included in the paragraphs above, the following discussion is devoted solely to an explanation of the basis for liability; for although the Court believes that the imposition of liability is compelled by the evidence, the medical practice giving rise to liability is somewhat unusual.

Geraldine Polischeck, plaintiff's decedent, first arrived at defendant's Naval Regional Medical Center ("NRMC") on Wednesday, October 25, 1978. She and her husband, the plaintiff, reported her symptoms which included a severe vertex headache of sudden onset, violent nausea, pain behind the eyes and elevated temperature. An examination further revealed elevated blood pressure. It was virtually undisputed among the experts who testified at trial that such a complex of symptoms would have at least suggested to a physician the *possibility* that the patient had suffered a subarachnoid hemorrhage, and it appears equally clear that a physician, exercising the degree of care required of physicians in Philadelphia in 1978, would have sought to confirm or refute that possibility. The plaintiff then established through highly qualified expert testimony that, had the possibility of a subarachnoid hemorrhage been considered, a

simple, risk-free, virtually infallible diagnostic test, the lumbar puncture, would have confirmed the diagnosis. Further, plaintiff's expert testified that, had the subarachnoid hemorrhage been diagnosed, plaintiff's decedent would have had a 75% chance of recovering and returning to her previous activities.

Standing between Geraldine Polischeck and that diagnosis was the government's practice of permitting patients to be treated and released from the emergency room at the Naval Regional Medical Center without having a licensed physician see either the patient or the patient's chart. Patients on their first visit would see only a physician's assistant, a person with only two years of paramedical training. Whether or not a physician should be called in was entirely within the physician's assistant's discretion. In the present case, because decedent's symptoms did not precisely fit the complex of symptoms which the physician's assistant had been trained to recognize as suggestive of a subarachnoid hemorrhage, the possibility of hemorrhage was never considered and a physician was not summoned.

It should be clear from all of this that the present case does not turn on the claim more common to medical malpractice actions that treating personnel have failed to perform their duties in conformity with the applicable standard of care. Plaintiff produced no expert to testify that Physician's Assistant Garman failed to conform to the standard of care for physician's assistants in failing to diagnose decedent's subarachnoid hemorrhage. Indeed, it hardly seems reasonable to expect a person with only two years of general medical training to be able to recognize a medical condition when it is presented in a patient possessing only some of the condition's textbook symptoms.[2]

---

**2.** Plaintiff has based his case in part on a claim that his wife's death was also proximately caused by the negligence of Dr. Acela SanFelipe, the physician who first saw the decedent on Friday, October 27, 1978, on decedent's second visit to the NRMC, and who also failed to test for a subarachnoid hemorrhage. Because it is not very clear from the record whether the decedent would have been likely to

recover fully even if her condition had been properly diagnosed on that Friday afternoon, we do not base our finding of liability on any negligence of Dr. SanFelipe at the time of the second visit. We do pause to note, however, that even after seeing Dr. SanFelipe, decedent had not seen a *licensed* physician at the NRMC. At the time of trial, Dr. SanFelipe, though trained at a medical school in the Philippines,

Thus, if liability is to be imposed upon defendant, it would stem not from the conduct of the medical personnel defendant employed, but from defendant's policy of having patients treated on their first visit by paramedically trained personnel without requiring a licensed physician to review at least the patient's chart prior to discharge of the patient.

In determining whether such a practice constituted a departure from the required standard of care, we must look to Pennsylvania law. *See* 28 U.S.C. § 2674. The Pennsylvania courts, however, apparently have yet to articulate in a published decision the standard of care governing hospitals in the development of policies for the care and treatment of their patients. In other jurisdictions, courts have variously stated the rule to be that a hospital has a duty to exercise that degree of care, skill and diligence employed by hospitals generally in the community, or that a hospital must exercise such reasonable care as the patient's known physical and mental condition may require. *See Kastler v. Iowa Methodist Hospital*, 193 N.W.2d 98 (Iowa 1971) and the authorities cited therein. We need not scrutinize this issue more closely, however, for under either formulation of the rule, defendant's policy and conduct were negligent.

Plaintiff's expert witness was clearly familiar with the practice of emergency rooms in several Philadelphia hospitals at about the time involved. He testified that even interns—medical school graduates—were customarily required to have at least the patient's chart reviewed by a physician at some time before or soon after the patient's discharge. What is more important, he testified that a practice of permitting a patient to be discharged from an emergency room without ensuring some review of the patient's record by a physician would not constitute reasonable medical care. Thus, there is qualified medical expert testimony that defendant's practice failed to conform

to the standard of care, whether that standard is measured by the practice of other hospitals in the community or by a general standard of reasonableness.

Defendant's expert witness, an expert in the field of emergency medical care, might well have been expected to contradict the opinion of plaintiff's expert on this point. The testimony elicited from defendant's expert, however, was often non-responsive, vague and imprecise, and thus less than helpful. When asked on direct examination whether in 1978 it would have been proper to discharge a patient from an emergency room without ever involving a licensed physician in the diagnosis, he answered that he was "not sure [he could] answer" the question, that it might depend on the skills of the particular individual. The point was not pursued. Thus, the opinion of plaintiff's expert, which was expressed without hesitation, went virtually unchallenged.

Plaintiff's contention is supported not only by the weight of expert opinion but also by reason alone. A person with only two years of general medical training cannot hope to have the same ability to recognize medical disorders as that possessed by a licensed physician having four years of formal medical training. The present case is only one example of the dangers involved in failing to recognize the difference. Accordingly, the Court must hold that defendant failed to conform to the applicable standard of care in permitting emergency room patients to be treated and discharged by paramedical personnel without requiring that either the patient or the patient's chart be reviewed by a licensed physician.

## CONCLUSIONS OF LAW

1. In failing to have a licensed physician personally examine plaintiff's decedent or review her chart prior to her discharge at the time of her first visit to the NRMC on Wednesday, October 25, 1978, defendant

had never been licensed to practice medicine in any state. Thus, although plaintiff and decedent made three trips to the NRMC in those few days, it was not until decedent arrived

unconscious at the Hospital of the University of Pennsylvania that she first saw a licensed physician.

acted negligently by failing to exercise the degree of care, skill and diligence employed by hospitals generally in the community, or such reasonable care as the plaintiff's decedent's known physical and mental condition required.

2. Defendant's failure to have decedent examined or her chart reviewed prior to her discharge on Wednesday, October 25, 1978, was a proximate cause of her death.

3. To compensate plaintiff for the losses he has sustained by reason of decedent's wrongful death, plaintiff is entitled to an award of damages in the amount of $245,178.94.

4. To compensate decedent's estate for the losses suffered by reason of decedent's death, decedent's estate is entitled to an award of damages in the survival action in the amount of $74,360.91.